Joseph **DRAGANOSKY**, Relator,

v.

**MINNESOTA BOARD OF PSYCHOLOGY, State of Minnesota, Respondent.**

No. C4–84–124.

Supreme Court of Minnesota.

May 17, 1985.

Linda E. Maseus, Minneapolis, for relator.

Audrey Kaiser Manka, Atty. Gen., Minneapolis, for respondent.

SIMONETT, Justice.

This appeal raises questions about the licensing procedures of the Minnesota Board of Psychology. The Court of Appeals found that the Board had acted arbitrarily in denying relator's variance application for a license. We reverse and affirm the Board's denial.

Relator Joseph Draganosky sought and was twice denied licensure as a "licensed consulting psychologist" by the Minnesota Board of Psychology, on the second occasion because his doctor's degree was not from a university accredited by a regional accrediting association. In August 1982, Draganosky applied again, this time seeking a variance, pursuant to Board rules, from the accreditation requirement. The Board denied the variance and Draganosky appealed to the Court of Appeals for judicial review. The Court of Appeals held that the Board's action was arbitrary and capricious; it reversed and remanded the case to the Board with directions to allow the variance and grant Draganosky licensure as a consulting psychologist. *Draganosky v. Minnesota Board of Psychology*, 352 N.W.2d 432 (Minn.App.1984). We have granted the Board's petition for further review.

Minn.Stat. § 148.91 (1984) establishes two levels of licensure, that of "licensed psychologist" and "licensed consulting psychologist." Draganosky has been a licensed psychologist in this state since 1979, but he seeks the more favorable licensure of a consulting psychologist.[1] To be a licensed consulting psychologist, the applicant, by statute, must pass a prescribed examination, have 2 years' experience in the area of practice, and have a doctorate with a major in psychology "from an educational institution meeting standards which may be prescribed by regulation of the board." Section 148.91, subds. 2 and 4(3), (4) (1984). Draganosky has passed the examination and has the requisite experience. He does not, however, have a doctorate from an appropriately accredited school.

Draganosky received his doctorate in psychology from Western Colorado University in 1978. Board rules require, however, that the degree be obtained from an "institution accredited by a regional accrediting association to grant a doctorate with a major in psychology." Minn.Rules § 7200.-1300 (1983) (formerly compiled at 7 MCAR § 10.003(A) (1982)). The problem is that Western Colorado University is not accredited by the North Central Association of Colleges and Schools, the regional accrediting agency recognized by the Board for schools in Colorado.

Even though an applicant's doctorate is from a nonaccredited school, the applicant might still obtain licensure by way of the Board variance procedures. In 1982 the Board adopted a rule providing that "[a] variance [from a Board rule] shall be granted if the licensee or applicant specifies alternative practices or measures equivalent to or superior to those prescribed."[2] This

---

1. A licensed psychologist need have only a master's degree, while a consulting psychologist must have a doctor's degree. Minn.Stat. § 148.-91, subds. 4, 5 (1984). A licensed psychologist has more limited employment opportunities and may engage in private practice only "in collaboration" with a licensed consulting psychologist in his field of practice. Minn.Stat. § 148.93 (1984).

2. Minn.Rules 7200.6000(3) (1983) (formerly compiled at 7 MCAR § 10.009(C) (1982)), which provides:

Subp. 3. Variances; application. A licensee or applicant may apply to the board for a time-limited variance from any rule except for any part of a rule which incorporates a statutory requirement. A variance shall be granted if the licensee or applicant specifies

alternative practices or measures equivalent to or superior to those prescribed in the rule in question and provides evidence that:

A. the rationale for the rule in question can be met or exceeded by the specified alternative practices or measures;

B. adherence to the rule would impose an undue burden on the licensee or applicant; and

C. the granting of the variance will not adversely affect the public welfare.

Subpart 6 of the same rule (formerly compiled at 7 MCAR § 10.009(F) (1982)) further states:

Subp. 6. Burden of proof. The burden of proof is upon the licensee or applicant to demonstrate that the requirements cited in * * * 3 have been met.

appeal concerns Draganosky's unsuccessful variance application requesting that his doctorate from Western Colorado University be accepted by the Board.

## I.

■ The Board determined that Western Colorado University had not been accredited by an agency with standards equivalent to those of North Central, the Board's recognized accrediting association, and, therefore, that relator's doctor's degree from Western Colorado University did not meet the requirements for a licensure variance. The dispositive issue in this appeal, as we see it, is whether this determination is supported by substantial evidence in view of the entire record as submitted. Minn.Stat. § 14.69(e) (1984). We hold that it is.

Presumably, to obtain a variance Draganosky had two avenues of proof: (1) He could show that the doctoral program in psychology at Western Colorado University was at least equivalent to doctoral programs in schools accredited by North Central; or (2) he could show that his school, while not accredited by North Central, was accredited by some other accrediting agency with standards of excellence and reliability at least equal to that of North Central. *See* Minn.Rules 7200.6000(3) (1983), *supra* footnote 2. Draganosky chose the second approach. He informed the Board that Western Colorado University had been accredited by the National Association of Private, Nontraditional Schools and Colleges (NAPNSC) and submitted materials about NAPNSC's organizational structure and accreditation procedures and criteria. The Board was not persuaded by this proof. It found that NAPNSC accreditation was not an equivalent alternative to North Central accreditation. Unlike North Central, NAPNSC was not recognized by the United States Department of Education as an accrediting agency, and, indeed, NAPNSC had twice been denied such recognition. *See* 20 U.S.C. § 1145(c) (1982) (providing that the Secretary of Education publish a list of reliable, nationally recognized accrediting agencies). Neither was NAPNSC recognized by the Council on Post-Secondary Accreditation. The Board also had some concern about the objectivity of NAPNSC because six of its founders were on the staff or faculty of Western Colorado University. Finally, Western Colorado University was not accredited by NAPNSC until 1980, 2 years after Draganosky received his degree, whereas Board rules require that the institution be accredited at the time the degree is granted. Minn. Rules 7200.1500 (1983) (formerly compiled at 7 MCAR § 10.003(C) (1982)). The evidence amply sustains the Board's refusal to equate NAPNSC with the North Central Association of Colleges and Schools.

## II.

Draganosky next claims that the denial of his variance was arbitrary and capricious and denied him equal protection of the law. We disagree. The record before us does not support either contention.

Draganosky's claim is based on a comparison with the Board's treatment of degrees issued by foreign schools. Under Board rules, "A degree from a foreign institution shall be accepted if the institution meets standards required for accreditation of a domestic institution." Minn. Rules 7200.1600 (1983) (formerly compiled at 7 MCAR § 10.003(D) (1982)). Ordinarily, foreign countries do not have regional accrediting agencies like North Central, but the foreign government will itself establish standards for schools within its borders, usually administered by a Ministry of Education. If the foreign school is recognized by its country's government, the Board may accept this recognition as meeting the standards required for accreditation of a domestic institution. If the foreign school lacks this recognition or if the governmental "recognition" is determined to be unsatisfactory, then the applicant with such a foreign degree must seek a variance under the same rule as an applicant from a domestic, nonaccredited school. Presumably, the applicant will then have to show that the doctoral program in psychology of the foreign school is at least the equivalent of

the doctoral program of a domestic, accredited school.

Draganosky argues that "[he] is in the same situation as an applicant who received a degree from a foreign institution." If this premise is accepted, then, argues Draganosky, he is being treated arbitrarily because: First, to treat foreign government recognition of a school the same as North Central accreditation of a domestic school has no basis in fact and "is simply not rational"; and, second, insofar as the variance procedure is concerned, the Board, as a matter of practice, is less stringent in its proof requirements for the foreign student than the domestic student.

■■■ We do not agree with relator's initial premise. Draganosky is not in the same situation as a graduate of a foreign school. Unlike domestic schools, foreign schools do not have available regional accrediting associations to evaluate their programs. The Board has chosen to use foreign government recognition as a substitute accrediting mechanism, and it has a rational basis for doing so.[3] One would expect foreign governments to be concerned with the quality of its schools. Draganosky says the Board has offered no evidence on what it considers to be satisfactory governmental "recognition," but the Board was not required to do so. The burden of proof was on relator to show that the recognition system was without a rational basis, and there is no such showing.

As for the variance procedure, it appears that applicants with degrees from domestic, nonaccredited schools may be similarly situated with applicants with degrees from foreign schools without adequate governmental recognition. At least, both classes of applicants must demonstrate that their degrees are equivalent to a degree from a regionally accredited domestic institution. The Board points out, however, that the kind of equivalency proof required of a foreign school may, because of foreign educational traditions, vary somewhat from the proof required for a domestic degree. Even so, argues Draganosky, in practice the Board's proof requirements are less stringent for the foreign applicant than for someone like him. He contends the Board acts inconsistently and, therefore, that the Board acted arbitrarily and capriciously in not accepting his doctorate for a variance.

In support of his claim of arbitrariness, Draganosky submitted, by stipulation, five instances where the Board, between 1974 and 1980, granted licensure as consulting psychologists to applicants with foreign doctorates. In three instances, the applicant was not required to show accreditation or recognition equivalent to accreditation by a regional accrediting agency; in the fourth instance, the applicant was not required to submit documentation of the accreditation of the foreign school; and in the fifth instance, that of a graduate of a school in The Netherlands, the Board accepted a letter from a university professor that the applicant was qualified. On the other hand, the Board says in its brief that

3. Clearly, the Board may use some agency other than itself to verify educational standards of schools that its applicants have attended. In the analogous situation of law school applicants for admission to the bar, where this court requires law schools to be accredited by the American Bar Association, we have said:

> We have not delegated our authority to the ABA but, instead, have simply made a rational decision to follow the standards of educational excellence it has developed. * * * We have neither the time nor the expertise to investigate individually the special training of an applicant or the program offered by specific law schools, and any attempt by us to do so would be inefficient and chaotic. Thus, it does not offend the constitution for us to

decide to utilize instead standards developed by a nongovernmental body with expertise in the area of legal education.

*Application of Hansen,* 275 N.W.2d 790, 796–97 (Minn.1978), *appeal dismissed* 441 U.S. 938, 99 S.Ct. 2154, 60 L.Ed.2d 1040 (1979) (want of substantial federal question).

Nor does the fact that relator Draganosky passed the prescribed psychology examination excuse him from the statutory requirement of having the requisite doctoral degree. As we said in *Hansen,* "We do not believe that passage of a bar examination is necessarily an equivalent measure of the characteristics of legal education which are important in the accrediting decision." *Id.* at 798.

since 1978 it has denied eight applications where the degree was from a nonaccredited school, one of these being from a foreign school.

There are two problems with this proof. First, and most significant, none of these cited instances of improper licensure approval involved a variance application. The variance rule under which this proceeding is brought was not adopted by the Board until 1982. There is absolutely no showing that the Board has applied its variance procedure in an arbitrary or discriminatory manner.

■■■ Second, even if the cited instances of licensure approval had occurred in the relevant time period, the stipulation, except for the applicant from The Netherlands, does not state on what information the Board did rely in recognizing the foreign degrees. For example, in three instances the Board accepted doctorates from Canadian universities. It is not clear if the Board did so on the basis that Canadian government recognition of the universities was the equivalent of North Central accreditation, or if the programs of the Canadian schools were the equivalent of the program of a domestic accredited school. The Board may or may not have acted properly in the pre-1982 cases, but on this record we cannot tell, and the burden of proof to show arbitrariness or discrimination being on the applicant, the claim fails. *See City of Moorhead v. Minnesota Public Utilities Comm'n*, 343 N.W.2d 843, 849

(Minn.1984) (agency decisions come to this court with the presumption of regularity and the burden is on person challenging agency action to prove that its decision was improper).[4] Even the case from The Netherlands is unclear and, at best, would only support the erroneous proposition that because one applicant is incorrectly granted licensure, another applicant such as relator should be incorrectly granted licensure too.

■■■ The parties speak of having resubmitted relator's variance application to the Board on "stipulated facts." However, this is not exactly what happened. Instead, the Board accepted for consideration all the information that relator chose to submit without disputing its accuracy, but with the proviso that "past Board action is within the knowledge of the Board as the decision-maker in this case. Therefore, past action by the Board of all cases will be considered." This proviso left the so-called stipulation openended and, consequently, leaves much of the so-called "record" elusive and solely within the Board's knowledge.[5] The Board asserts its variance rule is applied in a rational and nondiscriminatory manner, and it comes into court with the presumption that it has abided by its procedures. The burden of proof to show otherwise is on relator, and that burden, on this record, has not been met. The Court of Appeals decision is reversed and the decision of the Minnesota Board of Psychology

4. The unlawful administration by state officers of a statute or regulation resulting in unequal application to those entitled to equal treatment is not a denial of equal protection unless intentional or purposeful discrimination is shown. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 374–75, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886). A discriminatory purpose is not presumed. The proponent must show clear and intentional discrimination. *Snowden*, 321 U.S. at 8, 64 S.Ct. at 401. Intentional discrimination may "appear on the face of the action taken with respect to a particular class or person * * *, or it may be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself." *Id.* citing *Yick Wo*, 118 U.S. at 373–74, 6 S.Ct. at

1072–73. An erroneous or mistaken performance of a statutory duty may constitute a violation of the statute but will not without more constitute a denial of equal protection. *Id. See also Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 359 (6th Cir.1984); *Friedlander v. Cimino*, 520 F.2d 318 (2d Cir.1975).

5. Not only did the parties fail to agree on the facts, they were unable to agree on the issues. The Board took the position that its treatment of foreign degrees was irrelevant, and, therefore, it did not have to submit evidence on that issue. At least 1 month before the Board's final decision, relator was advised by letter that the Board took the position that "the licensure of foreign graduates is a separate issue, and not controlling in this case."

denying relator's application for a variance is affirmed.

Reversed.