767 N.W.2d 453 (2009)
In the Matter of the CONTEST OF GENERAL ELECTION HELD ON NOVEMBER 4, 2008, FOR the PURPOSE OF ELECTING A UNITED STATES SENATOR FROM the STATE OF MINNESOTA,
Cullen Sheehan and Norm Coleman, contestants, Appellants,
v.
Al Franken, contestee, Respondent.
No. A09-697.
Supreme Court of Minnesota.
June 30, 2009.
*456 Joseph S. Friedberg, Joseph S. Friedberg Chartered, James K. Langdon, Gretchen Agee, Dorsey & Whitney LLP, Minneapolis, MN; Tony P. Trimble, Matthew W. Haapoja, Trimble & Associates, Ltd., Minnetonka, MN; and Frederic W. Knaak, Knaak & Kantrud, P.A., Vadnais Heights, MN, for appellants.
Marc E. Elias, Kevin J. Hamilton, Lisa Marshall Manheim, Perkins Coie LLP, Washington, D.C.; and David L. Lillehaug, Richard D. Snyder, Fredrikson & Byron, P.A., Minneapolis, MN, for respondent.

OPINION
PER CURIAM.
Appellants, incumbent Republican United States Senator Norm Coleman and Cullen Sheehan, filed a notice of election contest under Minn.Stat. § 209.021 (2008), challenging the State Canvassing Board's certification that Democratic-Farmer-Labor challenger Al Franken was entitled to receive a certificate of election as United States Senator following the November 4, 2008 general election. After a trial, the three-judge trial court we appointed to hear the election contest issued its findings of fact, conclusions of law, and order for judgment, concluding that Franken received 312 more legally cast votes than Coleman and that Franken was entitled to a certificate of election for the office of United States Senator. The question presented on appeal is whether the trial court erred in concluding that Al Franken received the most legally cast votes in the election for United States Senator. Because we conclude that appellants have not shown that the trial court's findings of fact are clearly erroneous or that the court committed an error of law or abused its discretion, we affirm.
More than 2.9 million Minnesotans cast ballots in the November general election, including approximately 300,000 who voted or attempted to vote by absentee ballot. *457 On November 18, 2008, the State Canvassing Board accepted the consolidated statewide canvassing report as showing that Coleman received 1,211,565 votes and that Franken received 1,211,359 votes for the office of United States Senator, a margin of 206 votes in Coleman's favor. Because the margin separating the two candidates was less than one-half of one percent of the total number of votes counted for that office, the State Canvassing Board directed the Minnesota Secretary of State's Office to oversee a manual recount, as required by Minn.Stat. § 204C.35, subd. 1(b)(1) (2008).
The statewide manual recount was conducted between November 19, 2008, and January 5, 2009, pursuant to instructions drafted by the Secretary of State's Office and approved by the State Canvassing Board after consultation with representatives of Coleman and Franken. During the recount, local election officials and the candidates reviewed the absentee ballot return envelopes that had been rejected on or before election day and agreed that some of them had been improperly rejected. See Coleman v. Ritchie, 758 N.W.2d 306, 308 (Minn.2008). On January 3, 2009, the Secretary of State's Office opened and counted the 933 ballots identified during this process.[1] On January 5, 2009, the State Canvassing Board certified the results of the election as 1,212,431 votes for Franken and 1,212,206 votes for Coleman, a margin of 225 votes in Franken's favor.
On January 6, 2009, appellants Coleman and Sheehan (hereinafter "Coleman") filed a notice of election contest in Ramsey County District Court under Minn.Stat. § 209.021 (2008), contesting the election results certified by the State Canvassing Board and seeking a declaration that Coleman was entitled to the certificate of election as United States Senator. On January 12, 2009, under Minn.Stat. § 209.045 (2008), we appointed three judges to hear and determine the contest. Testimony in the trial commenced on January 26, 2009, and concluded on March 12, 2009. Coleman sought during trial to have additional absentee ballots counted.[2] No claim of fraud in the election or during the recount was made by either party.[3] At the conclusion of the trial, the court determined that 351 additional absentee ballot return envelopes satisfied the statutory requirements[4] and ordered that these envelopes be opened and the ballots inside counted.
On April 13, 2009, the trial court issued its findings of fact, conclusions of law, and order for judgment, finding that Franken received 1,212,629 votes and Coleman received 1,212,317 votes in the November 4, 2008 general election, a margin of 312 votes in Franken's favor. The court found that Franken received the highest number of votes legally cast in the election for United States Senator for the State of Minnesota and concluded that Franken was entitled to receive the certificate of election.
*458 The State Canvassing Board's certification is prima facie evidence that Franken, the contestee, has been elected to the office. See Berg v. Veit, 136 Minn. 443, 445, 162 N.W. 522, 522 (1917). Coleman, the contestant, bears the burden of proof in the trial to show that the Board's certification was in error. See id. at 445, 162 N.W. at 522. On appeal, we give the trial court's findings of fact in an election contest the same weight as a trial court's findings of fact in any civil action and will not set aside those findings unless Coleman demonstrates that they are clearly erroneous. In re Ryan, 303 N.W.2d 462, 465 (Minn.1981); Bank v. Egan, 240 Minn. 192, 194, 60 N.W.2d 257, 259 (1953). But we review a trial court's conclusions of law de novo. See Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 45 (Minn.2008).[5]
Appellants raise essentially five issues: (1) whether the trial court violated Coleman's right to substantive due process by requiring strict, rather than only substantial, compliance with the statutory requirements for absentee voting; (2) whether Coleman's right to equal protection of the laws was violated, either by differences among jurisdictions in their application of the statutory requirements for absentee voting or by the court's rulings on the statutory requirements for absentee voting; (3) whether the court erred in excluding certain evidence; (4) whether the court erred in declining to order inspections of ballots and other election materials for precincts in which Coleman alleges that ballots may have been double-counted during the manual recount; and (5) whether the court erred by including in the final vote tally the election day returns from one Minneapolis precinct in which some ballots were lost before the manual recount.

I.
We turn first to the question of whether Coleman's right to substantive due process under the United States Constitution has been violated. Whether Coleman's right to substantive due process[6] was violated is a question of law, which we review de novo. State v. Netland, 762 N.W.2d 202, 207 (Minn.2009).
During trial, the court identified, in an order issued February 13, 2009, ten categories of rejected absentee ballots that would not be considered legally cast as a matter of law because the ballots failed to comply with one or more of the statutory requirements for voting by absentee ballot.[7]See Minn.Stat. § 203B.12, subd. 2 *459 (2008). Coleman argues that this February 13 order imposed a standard of "strict" compliance with state law governing absentee ballots. Coleman asserts that the court's strict compliance standard departed from what had been a "substantial" compliance standard for acceptance of absentee ballots and application of a strict compliance standard resulted in a violation of substantive due process.
The United States Supreme Court has limited the reach of substantive due process to ensure that wrongs addressed are truly of a constitutional magnitude. See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). We have noted that "courts are `reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" Netland, 762 N.W.2d at 208 (quoting Collins, 503 U.S. at 125, 112 S.Ct. 1061). Decisions regarding challenges to the states' administration of elections reflect the limited reach of substantive due process. See Roe v. Alabama, 43 F.3d 574, 580 (11th Cir.1995) ("Not every state election dispute, however, implicates the Due Process Clause of the Fourteenth Amendment and thus leads to possible federal court intervention.... If, however, the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated...." (citations omitted) (internal quotations marks omitted)). Based on its review of cases involving substantive due process challenges to election procedures, the Ninth Circuit has identified two elements as common to cases in which a violation was established:
A general pattern emerges from all of these cases taken together. Mere fraud or mistake will not render an election invalid. However, a court will strike down an election on substantive due process grounds if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures.
Bennett v. Yoshina, 140 F.3d 1218, 1226-27 (9th Cir.1998) (footnote omitted).[8]
Although we have not previously considered substantive due process in the context of an election dispute, we agree with the federal courts and adopt the federal rule to determine whether a substantive due process violation has occurred in an election. To prevail on a claim that a change in election standards violated substantive due process, the contestant must show a change that is patently and fundamentally unfair. In other words, the contestant must show likely reliance by the voters on an existing election procedure and a change in that procedure that results in significant disenfranchisement of the voters. Under this standard, in order to sustain a substantive due process violation, Coleman must prove as a threshold matter that the post-election change about *460 which he complains  the trial court's adherence to a strict compliance standard  changed the procedures on which the voters relied on election day. See Bennett, 140 F.3d at 1226-27; Roe, 43 F.3d at 80-81.
Coleman asserts that the trial court's February 13 order established a new standard of strict compliance with absentee ballot requirements, whereas precedent of this court and the practices of election officials, on election day and during the manual recount, required only substantial compliance.[9] If, in fact, strict adherence was not what the law required, so that voters could be said to have relied on something less, Coleman's argument might warrant further examination. But the law, both as provided by statute and in our precedent, requires strict adherence.
The Minnesota Legislature has established the process for voting by absentee ballot. Generally, a prospective voter first submits a written application for an absentee ballot. Minn.Stat. § 203B.04, subd. 1 (2008). If the application complies with statutory requirements, the county auditor or municipal clerk sends the voter an absentee ballot, an absentee ballot return envelope, a ballot envelope (sometimes called a secrecy or security envelope), and a copy of the directions for casting an absentee ballot. Minn.Stat. § 203B.06, subd. 3 (2008); Minn.Stat. § 203B.07, subd. 1 (2008). If the applicant is not registered, the county auditor or municipal clerk includes a voter registration application. Minn.Stat. § 203B.06, subd. 4 (2008).
The voter marks the ballot before a witness and puts the ballot in the secrecy envelope. Minn. R. 8210.0500, subps. 2, 3 (2007). The voter then puts the secrecy envelope (and the registration application, if any) in the ballot return envelope. Id. The voter and the witness each sign the ballot return envelope. Minn.Stat. § 203B.07, subd. 3 (2008). The completed ballot return envelope is returned to the county auditor or municipal clerk. See Minn.Stat. § 203B.08, subd. 1 (2008). The next step in the absentee voting process is acceptance or rejection of the ballot return envelope by local election officials. The decision to accept or reject the ballot return envelope is made at the precinct by local election judges on election day, Minn. Stat. § 203B.12 (2008), or, if the local jurisdiction has an absentee ballot board, by the board in the 30 days before the election, Minn. Stat. § 203B.13, subd. 2 (2008). The ballot return envelope is marked "Accepted" if officials are "satisfied" that:
(1) the voter's name and address on the return envelope are the same as the information provided on the absentee ballot application;
(2) the voter's signature on the return envelope is the genuine signature of the individual who made the application for ballots and the certificate has been completed as prescribed in the directions for casting an absentee ballot, except that if a person other than the voter applied for the absentee ballot under applicable Minnesota Rules, the signature is not required to match;
(3) the voter is registered and eligible to vote in the precinct or has included a *461 properly completed voter registration application in the return envelope; and
(4) the voter has not already voted at that election, either in person or by absentee ballot.
Minn.Stat. § 203B.12, subd. 2. Section 203B.12, subd. 2, makes clear that "[t]here is no other reason for rejecting an absentee ballot."
On election day, the absentee ballot return envelopes are delivered to the absentee voters' respective polling places. Minn.Stat. § 203B.08, subd. 3 (2008). Before opening the accepted ballot return envelopes, election judges check each envelope against the precinct roster to be sure the voter has not voted in person or by another absentee ballot. See Minn. Stat. § 203B.12, subd. 3. If not, the election judges record those voters who voted by absentee ballot by marking the precinct roster with the notation "A.B." for each accepted absentee ballot return envelope. Id. Once the roster has been so marked, the voter cannot vote again in that election. Id. After the last mail delivery on election day, election judges open the accepted ballot return envelopes, remove the enclosed ballots from their secrecy envelopes, and then deposit the ballots in the ballot box. Id., subd. 4.
The trial court's February 13 order closely tracks the requirements of these statutes. But Coleman contends that our precedent allows for something less than strict compliance with the statutory mandates. We disagree.
Although we have used a substantial compliance standard to judge errors by election officials, we have held voters strictly to statutory requirements. In Wichelmann v. City of Glencoe, 200 Minn. 62, 66-67, 273 N.W. 638, 640 (1937), we observed:
The provisions of election laws requiring acts to be done and imposing obligations upon the elector which are personal to him are mandatory. He is personally at fault if he violates them. If his vote is rejected for such violations, it is because of his own fault, not that of election officials. Such provisions prescribe mandatory conditions precedent to the right of voting.
(Citing Pennington v. Hare, 60 Minn. 146, 150, 62 N.W. 116, 118 (1895); Truelsen v. Hugo, 81 Minn. 73, 79, 83 N.W. 500, 503 (1900); State v. Erickson, 152 Minn. 349, 351, 188 N.W. 736, 737 (1922).)[10]
In Wichelmann, we applied the principle of mandatory compliance with voter requirements specifically to absentee voting and affirmed an election contest court's rejection of absentee ballots because the voters failed to comply with an applicable law that made filing a verified application for an absentee ballot with the city clerk before the election a condition precedent to absentee voting. 200 Minn. at 66-68, 273 N.W. at 640. We explained that because the legislature established absentee voting as an optional method of voting, voters choosing to use that method are required to comply with the statutory provisions. Id. at 65-66, 273 N.W. at 639-40.
*462 The distinction between errors by voters and errors by election officials is an important one. We have drawn "a clear distinction between the provisions and prohibitions in the election laws which are personal to the elector and those which apply to election officials over whose conduct he has no control." Fitzgerald v. Morlock, 264 Minn. 520, 524, 120 N.W.2d 339, 345 (1963). We have said that "any reasonable regulations of the statute as to the conduct of the voter himself" are mandatory, and a vote is properly rejected if the voter fails to comply with the law. Id. at 524, 120 N.W.2d at 345. But if a voter complies with the law, his vote should not be rejected because of "irregularities, ignorance, inadvertence, or mistake, or even intentional wrong on the part of the election officers." Id. at 524, 120 N.W.2d at 345.
In Bell v. Gannaway, we again explained that voting by absentee ballot is a privilege, not a right, and affirmed the mandatory nature of absentee voting requirements. 303 Minn. 346, 353-54, 227 N.W.2d 797, 802-03 (1975). We reiterated that because "the privilege of absentee voting is granted by the legislature, the legislature may mandate the conditions and procedures for such voting." Id. at 353, 227 N.W.2d at 802.[11] We said there that strict compliance with the requirements for voting by absentee ballot is mandatory: "[V]oters who seek to vote under these provisions must be held to a strict compliance therewith." Id. at 354, 227 N.W.2d at 803.
We conclude that our existing case law requires strict compliance by voters with the requirements for absentee voting. Thus, we reject Coleman's argument that only substantial compliance by voters is required. Having rejected this argument, we also conclude that the trial court's February 13 order requiring strict compliance with the statutory requirements for absentee voting was not a deviation from our well-established precedent.
Because strict compliance with the statutory requirements for absentee voting is, and has always been, required, there is no basis on which voters could have reasonably believed that anything less than strict compliance would suffice. Furthermore, Coleman does not cite, and after review of the record we have not found, any evidence in the record that election officials required only substantial compliance in any past election or any official pronouncements that only substantial compliance would be required in the November 4, 2008 election. Nor does Coleman point us to the testimony of any voter who neglected to comply with the statutory requirements for absentee voting in reliance on either past practice or official assurances that strict compliance was not required. Indeed, Coleman's counsel acknowledged during oral argument that Coleman cannot claim that any voters changed their behavior based on the alleged substantial compliance standard.
For all of these reasons, we hold that Coleman has not proven that the trial court's February 13 order violated substantive due process.

II.
We next examine Coleman's argument that the constitutional guarantee of equal protection was violated in this case.[12] Coleman's equal protection argument *463 is two-fold. First, he argues that the differing application and implementation by election officials of the statutory requirements for absentee voting violated equal protection. Essentially, Coleman contends that similarly situated absentee ballots were treated differently depending on the jurisdiction in which they were cast and that this disparate treatment violated equal protection. Second, Coleman contends that equal protection was violated when the trial court adhered to the statutory requirements for acceptance of absentee ballots, in contrast to the practices of local jurisdictions during the election.
Both parts of Coleman's equal protection argument depend on his assertion that differential application, either by election officials or by the trial court, of the statutory requirements for absentee voting violates equal protection. But equal protection is not violated every time public officials apply facially neutral state laws differently. The United States Supreme Court has held that "an erroneous or mistaken performance of [a] statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws." Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). The Court then explained that the "more" that is required for a violation of equal protection is intentional or purposeful discrimination. Id. The Court said:
The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.
Id.; see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause); Washington v. Davis, 426 U.S. 229, 240-42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (same).
In Snowden, Joseph Snowden charged that members of the Illinois State Primary Canvassing Board "willfully, maliciously and arbitrarily" failed to certify him as a nominee for state office and that their failure to do so "constituted `an unequal, unjust and oppressive administration' of the laws of Illinois." 321 U.S. at 4, 64 S.Ct. 397. In rejecting Snowden's claims, the United States Supreme Court noted that "not every denial of a right conferred by state law involves a denial of the equal protection of the laws." Id. at 8, 64 S.Ct. 397. The Court also noted that "[a] construction of the equal protection clause which would find a violation of federal right in every departure by state officers from state law is not to be favored." Id. at 11-12, 64 S.Ct. 397. Even though Snowden alleged that the state primary canvassing board had acted "willfully," the Court observed that Snowden had not alleged "any facts tending to show that in refusing to certify [him] as a nominee, the Board was making any intentional or purposeful discrimination between persons or classes." Id. at 7, 64 S.Ct. 397. Snowden's failure to show any intentional or purposeful discrimination against any individual or class doomed his claim.
We applied similar principles in declining to find an equal protection violation *464 when a government agency strictly applies the law in one case but not in another. See Draganosky v. Minn. Bd. of Psychology, 367 N.W.2d 521, 526 n. 4 (Minn.1985). We explained that "unlawful administration by state officers of a statute or regulation resulting in unequal application to those entitled to equal treatment is not denial of equal protection unless intentional or purposeful discrimination is shown." Id. (citing Snowden, 321 U.S. at 8, 64 S.Ct. 397). Further, we said that "[a]n erroneous or mistaken performance of a statutory duty may constitute a violation of the statute but will not without more constitute a denial of equal protection." Id.
We conclude that the standard applied in Snowden and Draganosky is the proper standard to apply in this case. Accordingly, in order to prevail on his equal protection claim of disparate application of a facially neutral statute, Coleman was required to prove either that local jurisdictions' differences in application or the trial court's application of the requirements for absentee voting was the product of intentional discrimination. Coleman neither claims nor produced any evidence that the differing treatment of absentee ballots among jurisdictions during the election was the result of intentional or purposeful discrimination against individuals or classes. Nor does Coleman claim that the trial court's February 13 order, establishing certain categories of ballots as not legally cast, was the product of an intent to discriminate against any individual or class.
On appeal, Coleman contends that he proved an equal protection violation by showing that local election officials made deliberate and intentional decisions to adopt particular interpretations of the statutory requirements for absentee voting. Under Snowden, however, the fact that the official's decision to act in a particular way was deliberate does not constitute discriminatory intent. See 321 U.S. at 10, 64 S.Ct. 397 (explaining that the requirement of intentional discrimination is not satisfied by allegations of willful, malicious conduct). Instead, Snowden requires a showing that the statutory standards were applied differently with the intent to discriminate in favor of one individual or class over another. Id. at 8, 64 S.Ct. 397.[13]
The trial court found that election judges applied the election laws in a consistent and uniform manner. The court found that election jurisdictions adopted policies they deemed necessary to ensure that absentee voting procedures would be available to their residents, in accordance with statutory requirements, given the resources available to them. The court also found that differences in available resources, personnel, procedures, and technology necessarily affected the procedures used by local election officials reviewing absentee ballots. But the court found that Coleman did not prove that these differences were calculated to discriminate among absentee voters.[14] Our review of *465 the record convinces us that the trial court's findings are supported by the evidence and are not clearly erroneous. As a result, we conclude that Coleman did not prove his equal protection claim.[15]
Coleman makes the additional argument that the non-uniform application of the statutory standards for absentee voting nevertheless brings this case within the ambit of the United States Supreme Court's decision in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam). In Bush, the Court held that the statewide recount of the 2000 presidential election that had been ordered by the Florida Supreme Court violated equal protection. Id. at 103, 121 S.Ct. 525. Coleman argues that, in Minnesota's 2008 United States Senate election, different local election jurisdictions treated similarly situated absentee ballots differently and that the trial court imposed a stricter standard for compliance with absentee voting requirements than did election officials, and that those differences violate equal protection under Bush.[16]
The trial court concluded that Bush is distinguishable in several important respects *466 and, as a result, does not support Coleman's equal protection claim. We agree. In Bush, the Supreme Court specifically noted that it was not addressing the question of "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." 531 U.S. at 109, 121 S.Ct. 525. Variations in local practices for implementing absentee voting procedures are, at least in part, the question at issue here. As previously noted, the trial court here found that the disparities in application of the statutory standards on which Coleman relies are the product of local jurisdictions' use of different methods to ensure compliance with the same statutory standards; that jurisdictions adopted policies they deemed necessary to ensure that absentee voting procedures would be available to their residents, in accordance with statutory requirements, given the resources available to them; and that differences in available resources, personnel, procedures, and technology necessarily affected the procedures used by local election officials in reviewing absentee ballots. As we noted previously, Coleman has not demonstrated that these findings are clearly erroneous.
Additionally, the essence of the equal protection problem addressed in Bush was that there were no established standards under Florida statutes or provided by the state supreme court for determining voter intent; as a result, in the recount process each county (indeed, each recount location within a county) was left to set its own standards for discerning voter intent.[17]See id. at 106, 121 S.Ct. 525. Here, there were clear statutory standards for acceptance or rejection of absentee ballots, about which all election officials received common training.
Finally, the decision to be made by Florida election officials with which the Supreme Court was concerned in Bush was voter intent  that is, for whom the ballot was cast  as reflected on ballots already cast in the election. 531 U.S. at 106, 121 S.Ct. 525. In Bush, officials conducting the recount were reviewing the face of the ballot itself, see id. at 106-07, 121 S.Ct. 525, creating opportunities for manipulation of the decision for political purposes. Here, the decision at issue was whether to accept or reject absentee ballot return envelopes before they were opened, meaning that the actual votes on the ballot contained in the return envelope were not known to the election officials applying the standards. In summary, we conclude that Bush v. Gore is not applicable and does not support Coleman's equal protection claim.
For all of these reasons, we conclude that Coleman has not proven that either election officials or the trial court violated his right to equal protection.

III.
Coleman next contends that the trial court improperly excluded (1) evidence of absentee ballots accepted on election day and in the manual recount that would not satisfy the standards established *467 by the trial court, and (2) evidence of disparities among jurisdictions in their application of the statutory standards governing absentee ballots. We review the trial court's evidentiary rulings for abuse of discretion. See Peterson v. BASF Corp., 711 N.W.2d 470, 482-83 (Minn. 2006).

A.
Coleman argued at trial that as a result of the trial court's February 13 order finding that certain ballots were not legally cast, there are absentee ballots included in the State Canvassing Board's certification of election results that would have been rejected if the strict compliance standard of the trial court had been applied to them. Coleman therefore argued that if the court did not adopt the substantial compliance standard that Coleman claims was used on election day, the court was required to apply a strict compliance standard to ballots already accepted and counted on election day and reduce the parties' vote totals for any ballots that did not meet that standard.
The trial court rejected Coleman's argument and the evidence Coleman offered to support it. Coleman made an offer of proof identifying absentee ballot return envelopes that had been opened and the enclosed ballots removed and counted on election day or during the manual recount. Coleman did not seek to present evidence identifying the ballots removed from those envelopes and could not have done so, because once the ballots were removed from the envelopes and deposited in the ballot box, they were commingled with other counted ballots and could not be identified. We conclude that the court did not abuse its discretion in excluding this evidence because the legislature has foreclosed any challenge to the legality of an absentee ballot based on the return envelope once the ballot has been deposited in the ballot box.
Minnesota Statutes § 204C.13, subd. 6 (2008), provides, in pertinent part:

At any time before the ballots of any voter are deposited in the ballot boxes, the election judges or any individual who was not present at the time the voter procured the ballots, but not otherwise, may challenge the eligibility of that voter and the deposit of any received absentee ballots in the ballot boxes.
(Emphasis added.) The plain language of this statute requires challenges to absentee ballot envelopes to be made, if at all, before the ballots are deposited in the ballot box. Because the accepted absentee ballots at issue in this case were opened and deposited in the ballot boxes on election day, section 204C.13, subd. 6, bars Coleman's challenge to them during the election contest or in this appeal.[18]
We reached the same result in Bell v. Gannaway, 303 Minn. 346, 227 N.W.2d 797 (1975), in which we construed and applied a predecessor statute to section 204C.13, subd. 6. Bell was decided under Minn.Stat. § 204.11, subd. 4 (1974), which read, in relevant part, as follows:
The voter and the ballots of any absent voter at any time before the ballots have been deposited in the ballot boxes are subject to a challenge by the judges or by any person who was not present at the time the voter procured the ballots, but not otherwise. The question shall be determined in the same manner as is provided for the challenge of voters, and *468 if the voter or the ballots of any absent voter are found to be disqualified, the ballots so prepared shall be placed unopened among the spoiled ballots.
The language of the current statute, section 204C.13, subd. 6, is virtually the same, differing only in the positioning of some of its clauses.
Bell was an appeal from the trial of an election contest. After we had resolved issues concerning other ballots, the results of the election at issue turned on the validity of a single absentee ballot that we described as "clearly invalid." 303 Minn. at 350, 227 N.W.2d at 801. The voter had failed to sign the certification on the back of the absentee ballot return envelope. Id. at 352, 227 N.W.2d at 802. As a result, the voter "never made the required oath of residence and eligibility." Id. at 352, 227 N.W.2d at 802. We agreed that such failure "would require that the ballot be rejected if timely challenge is made." Id. at 355, 227 N.W.2d at 804. But because the contestant did not challenge the ballot envelope before it was opened and the ballot inside deposited in the ballot box with other ballots, we concluded that "contestant's challenge to this absentee ballot came too late." Id. at 356, 227 N.W.2d at 805.
The legislature has declared in section 204C.13, subd. 6, that once an absentee ballot has been deposited in the ballot box and commingled with other ballots, only challenges based on the face of the ballot itself  such as identifying marks or voting for too many candidates  can be raised. That was our construction in Bell of the predecessor statute, and Coleman has presented no compelling reason why the current statute should not be similarly construed.[19]
*469 In enacting section 204C.13, subd. 6, particularly in light of our interpretation of the same language in Bell, the legislature made a policy decision to limit challenges to an absentee ballot, once it is separated from its return envelope and deposited in the ballot box, to challenges based on the face of the ballot. We conclude that the trial court ruled correctly that Minnesota law provides no remedy for wrongly accepted absentee ballot return envelopes once those envelopes have been opened and the ballots inside deposited in the ballot box. Accordingly, we conclude that the court did not abuse its discretion in excluding the evidence.

B.
Coleman also argues on appeal that the trial court improperly precluded him from introducing additional evidence of "local officials' widely differing practices for accepting absentee ballots" on election day. Coleman made an offer of proof of the evidence he sought to introduce. We conclude the court did not abuse its discretion in excluding this evidence.
As we have explained, in order to prevail on his equal protection claim, Coleman was required to prove intentional or purposeful discrimination on the part of either local election officials or the trial court. But Coleman does not contend that the additional evidence he sought to introduce would have proven intentional or purposeful discrimination on the part of any election officials or the trial court. We therefore conclude that in excluding this evidence, the court did not abuse its discretion.

IV.
Coleman also claims that the trial court erred in denying his petition for inspection of ballots for certain precincts in which he alleges that double-counting of ballots occurred. The trial court concluded that Coleman had not met his burden to show that an inspection was needed to prepare for trial, noting Coleman's concession at the hearing on the petition that he would be able to prove his case without an inspection, by calling election judges as witnesses and by subpoenaing voter rolls and ballots. The court also concluded that inspections under Minn.Stat. § 209.06 (2008) are limited to the ballots themselves and do not include voter rolls or other election materials sought by Coleman. Finally, the court noted that the parties had already reviewed the ballots during the manual recount.
Under Minn.Stat. § 209.06, subd. 1, once an election contest has been filed, any party may request inspection of ballots cast in particular precincts by filing a verified petition "stating that the case cannot properly be prepared for trial without an inspection of the ballots." The inspectors' task is to "recanvass the votes cast for the parties to the contest ... in accordance with the rules for counting ballots in the Minnesota Election Law." Id., subd. 3. The inspectors then "make a written report of the inspection indicating the number of votes cast for each candidate ... in each precinct where the ballots were inspected and indicating any disputed ballots upon which the inspectors cannot agree." Id. Because a statutory inspection of ballots is essentially a discovery device, we review the trial court's denial of the requested inspection for abuse of discretion. *470 See Shetka v. Kueppers, Kueppers, Von Feldt & Salmen, 454 N.W.2d 916, 921 (Minn.1990).
Coleman argues that he had an absolute right to inspection under section 209.06 and that the trial court had no discretion to deny his petition. Coleman contends that the denial of the inspection foreclosed his ability to gather information to fully present his case of double-counting of unmarked duplicate ballots during the manual recount.[20] Coleman's claim that the statute provides an absolute right to an inspection is contrary to our ruling in Christenson v. Allen, 264 Minn. 395, 119 N.W.2d 35 (1963). In Christenson, we said that under the plain language of section 209.06, an inspection is allowed only upon a showing that an inspection is needed to prepare for trial of the election contest. 264 Minn. at 400, 119 N.W.2d at 39.
Coleman conceded at the hearing on the petition for inspection, and does not dispute here, that he could prove his claim of double-counting by subpoenaing the ballots and election materials and by subpoenaing witnesses to testify. This concession negates any claim that he made the required showing of necessity and any contention that he was prevented from proving his case by denial of the inspection. Coleman called no witnesses with direct knowledge of the handling of duplicate ballots in the relevant precincts, but he did introduce at trial voter rosters, envelopes from accepted absentee ballots, copies of ballots challenged during the manual recount, and machine tapes from the identified precincts in which he alleges double-counting of absentee ballots occurred. On appeal, Coleman has identified nothing additional that an inspection of ballots under section 209.06 would have produced.[21] We therefore hold that the trial court did not abuse its discretion in denying the petition for inspection.

V.
Finally, Coleman contends that the trial court erred when it ruled that missing ballots from Minneapolis Ward 3, Precinct 1, were properly included in the State Canvassing Board's January 5, 2009 certification of legally cast votes. During the manual recount, election officials could locate only four of the five envelopes of ballots from Minneapolis Ward 3, Precinct 1. Voting machine tapes showed a total of 2,028 ballots cast and counted in the precinct on election day, but only 1,896 ballots from the precinct were available for the recount, a difference of 132 ballots. The State Canvassing Board determined that an envelope of ballots had been lost and, rather than certify only 1,896 votes in the recount, accepted the election day returns for that precinct.
The trial court found no allegations or evidence of fraud or foul play and no evidence to suggest that the election day totals from the precinct are unreliable. The court therefore found "that 132 ballots from Minneapolis Precinct 3-1 were cast *471 and properly counted on Election Day and were lost at some point after they were counted on Election Day but before the administrative recount." We overturn a trial court's findings only if they are clearly erroneous, In re Ryan, 303 N.W.2d 462, 465 (Minn.1981), and review a trial court's conclusions of law de novo, Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 45 (Minn. 2008).
We addressed a similar situation in Moon v. Harris, 122 Minn. 138, 142 N.W. 12 (1913). In the 1912 race for registrar of deeds of Beltrami County, the county canvassing board declared Harris the winner over Moon by five votes. Id. at 139, 142 N.W. at 12. But in the recount, the ballots from two of the 67 precincts in the county could not be found. Id. at 141, 142 N.W. at 13. We ruled that the official returns for the two missing precincts should be used in lieu of the missing ballots: "The official returns are evidence of the votes cast. The presumption is that they correctly state the result of an accurate count of the ballots." Id. at 141, 142 N.W. at 13.
Coleman articulates no compelling reason why that same principle should not apply here. The ballots are missing, but Coleman introduced no evidence of foul play or misconduct, and the election day precinct returns are available to give effect to those votes. We hold that the trial court did not err in ruling that the election day precinct returns for Minneapolis Ward 3, Precinct 1, were properly included in the tally of legally cast votes.

VI.
For all of the foregoing reasons, we affirm the decision of the trial court that Al Franken received the highest number of votes legally cast and is entitled under Minn.Stat. § 204C.40 (2008) to receive the certificate of election as United States Senator from the State of Minnesota.[22]
Affirmed.
MAGNUSON, C.J., and ANDERSON, G. BARRY, J., took no part in the consideration or decision of this matter.
NOTES
[1] During trial, the parties stipulated that the 933 ballot envelopes had been properly opened and the ballots inside had been properly counted. As part of the stipulation, Coleman dismissed with prejudice all claims relating to these ballots.
[2] Franken's counterclaim also alleged that certain rejected absentee ballots should be accepted as legally cast, and Franken introduced evidence during the trial to support his counterclaim. Franken did not appeal from the trial court's judgment.
[3] Coleman's counsel confirmed at oral argument that Coleman makes no claim of fraud on the part of either voters or election officials.
[4] See Minn.Stat. § 203B.12, subd. 2 (2008).
[5] An election contest involving an office of the United States Congress is governed by the special provisions of Minn.Stat. § 209.12 (2008). Section 209.12 limits the question to be decided by the trial court to which candidate received the highest number of votes legally cast at the election and is therefore entitled to receive the certificate of election. The court is to take evidence on other grounds raised in the notice of contest, but is not to make findings on other issues. Id. After a final determination of the contest, on the request of either party, the record must be transmitted to the house of Congress for which the election was held, in this case, the Senate. Id. The Senate has the final authority as to who is seated. U.S. Const., art. I, § 5; see Franken v. Pawlenty, 762 N.W.2d 558, 567 (Minn.2009).
[6] Franken argues that Coleman failed to raise his due process claim in his notice of election contest and, therefore, that claim is not properly before us. See Minn.Stat. § 209.021, subd. 1 (2008). An election contest is an adversarial proceeding that "so far as practicable" is governed by the Rules of Civil Procedure and the Rules of Evidence. See Minn. Stat. § 209.065 (2008). We conclude that the due process issue was sufficiently raised after the trial court filed its February 13, 2009 order and, therefore, is properly before us.
[7] For example, the trial court ruled on February 13 that an absentee ballot cast by a non-registered voter was not legally cast.
[8] Cases cited by Coleman illustrate the kind of post-election change in standards that can constitute a due process violation. For example, in Roe, after the election, a state circuit court ruled for the first time that no absentee ballot could be excluded for lack of notarization or lack of witnesses, even though those requirements had previously been enforced for years. 43 F.3d at 578-79; see also Griffin v. Burns, 570 F.2d 1065, 1078-79 (1st Cir. 1978) (holding that due process was violated when absentee balloting was disallowed post-election after it had been allowed in previous elections for years); Briscoe v. Kusper, 435 F.2d 1046, 1055 (7th Cir. 1970) (holding that due process was violated when signature requirements were enforced for the first time).
[9] The trial court concluded that it must enforce all requirements imposed by law upon voting by absentee ballot because our cases make those requirements mandatory for voters. The court found support for this conclusion in the facts that: (1) "the Minnesota Legislature has made voting in person relatively straightforward by permitting same-day voter registration," reflecting a policy decision to encourage voting in person on Election Day; and (2) "requiring compliance with the voting laws ultimately minimizes the risks of fraud and illegal voting that act as a detriment to a fair electoral process."
[10] Coleman relies on language from In re Andersen, 264 Minn. 257, 119 N.W.2d 1 (1962), for the proposition that voters need only substantially comply. In Andersen, we stated that "[a]s long as there is substantial compliance with our laws and no showing of fraud or bad faith, the true result of an election, once ascertained, ought not be defeated by an innocent failure to comply strictly with the statute." Id. at 267, 119 N.W.2d at 8. Our reference to substantial compliance in Andersen, however, addressed the failure of local election officials to follow proper procedures in correcting election returns-not errors committed by voters, whether absentee or in person. See id. at 263-67, 119 N.W.2d at 6-8.
[11] At oral argument, Coleman posited that because of the increased use of the absentee voting method, it should now be treated as a right, not a privilege. But that is a policy determination for the legislature, not this court, to make.
[12] The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Article I, Section 2, of the Minnesota Constitution similarly provides that "[n]o member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land."
[13] The Supreme Court observed in Snowden that intent to discriminate could also be demonstrated by evidence of systematic discrimination "so that the practical effect of the official breach of law is the same as though the discrimination were incorporated in and proclaimed by the statute." 321 U.S. at 9, 64 S.Ct. 397. Coleman neither claims nor introduced evidence of any systematic discrimination.
[14] In United National Corp. v. County of Hennepin, 299 N.W.2d 73, 76 n. 3 (Minn. 1980), a tax case, we suggested in dicta that decisions such as Snowden that require a showing of purposeful discrimination "are not constitutionally compelled but are based on a need for federal-state comity." See Southland Mall, Inc. v. Garner, 455 F.2d 887, 889 (6th Cir.1972) ("The federal courts have rigorously enforced the rule that discriminatory intention must be shown lest routine complaints about the accuracy of an assessment, more properly heard in a state court familiar with local practice, clog the federal docket, disturbing federal-state relations...."). We examined whether the government action at issue was intentionally discriminatory, but we also extended the inquiry to cover "arbitrary" governmental conduct. United Nat'l, 299 N.W.2d at 76. In another case alleging discriminatory valuations for property tax purposes, we referenced arbitrary conduct as a possible basis for an equal protection claim of disparate application of a statute. See Programmed Land, Inc. v. O'Connor, 633 N.W.2d 517, 530 (Minn.2001) (rejecting an equal protection claim of discriminatory property taxation, explaining: "[w]here, as here, the differential treatment is alleged to arise only from bureaucratic errors, the standard of intentional, arbitrary or systematic discrimination necessary to prove a violation of equal protection rights is not satisfied"). Our analysis of the conduct at issue in these tax cases seems to have been driven in part by the Uniformity Clause in the Minnesota Constitution, Article X, Section 1, which provides that "[t]axes shall be uniform upon the same class of subjects." See United Nat'l, 299 N.W.2d at 77 n. 5 ("In clarifying today that a taxpayer need not demonstrate intentional discrimination in the valuation of property for tax purposes[,]... we observe that the requirements under the uniformity clause of the state constitution and the equal protection clause of the federal Constitution are not coterminous."). In this case, by contrast, we address only the constitutional guarantee of equal protection, and the arbitrary standard utilized in the tax context does not apply.
[15] Although we affirm the trial court's conclusion that any differences in the application of the statutory standard by the trial court and by election officials on election day and during the manual recount are not of constitutional magnitude, we do not suggest that any such differences are inconsequential and need not be addressed. It is impossible to eliminate all variation in a process administered at thousands of locations around the state by thousands of people, many of them temporary volunteers. To the extent that this case has brought to light inconsistencies in the administration of absentee voting standards, we are confident that the appropriate officials in the other branches of government understand that efforts should be made to reduce those inconsistencies, even though they were not proven to be of constitutional magnitude.
[16] Coleman also relies on Erlandson v. Kiffmeyer, 659 N.W.2d 724, 733-35 (Minn.2003), in which we struck down a statute on equal protection grounds without invoking the requirement of discriminatory intent. But the equal protection claim there was not based on the disparate impact of a facially neutral law. Rather, it was a challenge to a statute that on its face established two classes of absentee voters, one that could obtain a replacement ballot and one that could not. Id. at 732. The statute at issue here, Minn.Stat. § 203B.12, subd. 2, makes no classification among voters.
[17] The Court in Bush identified three additional problems in the recount procedures that contributed to its conclusion that the circumstances in Florida failed to provide "at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." 531 U.S. at 109, 121 S.Ct. 525. Those problems were: (1) the state court had ordered some recounts to be included that considered both undervotes and overvotes, but the new recounts were to include only undervotes; (2) there was no assurance that all recounts included in the final totals would be complete; and (3) people with no experience in interpreting ballots were recounting the votes, and observers were not allowed to make objections. Id. at 107-09, 121 S.Ct. 525. Coleman has not argued that any of these problems were present in this election.
[18] We also agree with the trial court that Coleman is barred from making this claim with respect to any of the 933 ballots that were rejected on election day but were opened and counted during the recount by the agreement of the parties, by virtue of his stipulation dismissing with prejudice all claims with respect to those ballots.
[19] Coleman contends that he should not be barred from challenging accepted absentee ballots during the election contest because he had no prior opportunity to challenge them. He argues that he proved his inability to challenge absentee ballots on election day by the testimony of three election officials. Our review of the record reveals that, although these officials testified as to the role of challengers with respect to in-person voters, none of these officials testified as to what would have happened if a challenger had asserted the statutory right to challenge absentee ballot return envelopes at the polls on election day. Nor was there testimony that any challenger attempted to exercise that right on election day on Coleman's behalf and was refused. In short, Coleman did not prove that he was precluded from following the procedure the legislature has established.

Coleman also argues that he was unable to challenge absentee ballots in jurisdictions that use absentee ballot boards. We recognize that, unlike when Bell was decided, Minnesota law now allows local election jurisdictions to use absentee ballot boards to accept or reject absentee ballot envelopes in the 30 days before the election. See Minn.Stat. § 203B.13, subd. 2. When an absentee ballot board makes the decision to accept or reject absentee ballot envelopes before the election, there is no opportunity to challenge certain aspects of those absentee ballots at the polling place on election day. Thus, contestants are unable to assert challenges involving the absentee ballot application, such as comparison of the voter's signature on the application to that on the ballot return envelope. Challenges based solely on the absentee ballot return envelope, such as lack of a voter signature or a witness's address, can still be made because those envelopes are at the polling place and are checked against the precinct roster by the election judges before they are opened.
We must presume the legislature was aware of section 204C.13, subd. 6, when it allowed absentee ballot boards to accept or reject absentee ballot envelopes but made no exception to the deadline for challenges established in section 204C.13, subd. 6, for jurisdictions where absentee ballot boards are used. The legislature recodified the challenge provision, Minn.Stat. § 204C.13, subd. 6, in April 1981. Act of April 14, 1981, ch. 29, art. 5, § 13, 1981 Minn. Laws 38, 103. The legislature amended the statute governing absentee ballot boards (then called absentee ballot counting boards) to allow them to accept or reject absentee ballot return envelopes just a month later. Act of May 13, 1981, ch. 185, § 3, 1981 Minn. Laws 643, 646. It is the prerogative of the legislature, not this court, to provide the right to challenge decisions of an absentee ballot board. See Hutchinson Tech., Inc. v. Comm'r of Revenue, 698 N.W.2d 1, 12 (Minn. 2005) (holding that the court cannot "write into a statute what the legislature did not").
[20] Briefly stated, Coleman alleges that when election officials made duplicate ballots on election day to replace damaged ballots that could not be read by the optical scan voting machines, they neglected to mark the duplicates as duplicates, as required by statute. See Minn.Stat. § 206.86, subd. 5 (2008). Coleman theorizes that both the original and the unmarked duplicate of some ballots were counted during the manual recount, resulting in extra votes tallied in some precincts.
[21] The trial court made detailed factual findings concerning Coleman's claim of double-counting and ultimately found that "[c]ontestants did not prove by a preponderance of the evidence that any double counting of votes occurred." On appeal, Coleman has not challenged those findings, nor has he proven that any of those findings are clearly erroneous.
[22] The Clerk of Appellate Courts is directed to enter judgment in this appeal under Minn. R. Civ.App. P. 136.02 immediately upon the expiration of the time for filing a petition for rehearing provided in Minn. R. Civ.App. P. 140.01, if no petition has been filed.