STATE v. ALICE SULLIVAN, d.b.a. MERLE NORMAN COSMETIC STUDIO, AND ANOTHER.[1]

June 10, 1955.

Nos. 36,582, 36,583.

[1]Reported in 71 N. W. (2d) 895.

104

*Harry H. Peterson* and *Thomas H. McMeekin,* for appellants.

*Miles Lord,* Attorney General, *Charles A. Sawyer,* City Attorney, and *Joseph A. Hadley,* Assistant City Attorney, for respondent.

MATSON, JUSTICE.

Defendants appeal from an order denying their separate motions in the alternative for judgment or a new trial.

Defendants, Alice Sullivan and Regina Benike (herein designated as Sullivan and Benike), were each convicted of violating M. S. A. 155.01 and 155.02 of the Minnesota beauty culture act. By stipulation, both cases were consolidated and tried together. Sullivan was found guilty of operating and managing a beauty culture shop without a license and of failing to hire a licensed manager-operator to run same. Defendant Benike was convicted of unlawfully engaging without a license in the practice of beautifying the face by the use of cosmetic preparations for compensation or other reward.

Sullivan owns and operates a cosmetic shop in Minneapolis where she sells a line of cosmetics manufactured by the Merle Norman Company of California. The products sold are facial creams, facial liquids, powder bases, face powders, and other similar preparations. Sullivan's shop consists of a reception room in which there is a showcase for the display of the merchandise sold by her and also another room in which there are four booths, a basin with running water, some small tables, chairs, and some mirrors. She has three employees of whom Benike is one. Sullivan paid Benike for her services a salary of seven dollars per day and a five percent commission on all sales made by her.

Persons who come to Sullivan's place of business and who are interested in the purchase of cosmetics are given a free demonstration of the products. They are under no obligation to buy and frequently do not make any purchase. The purpose of the demonstrations is to induce people coming to the studio to buy the Merle Norman line of cosmetics sold by defendants. Each demonstration involved these steps: (1) The application of a cleansing cream to the face of the prospective customer, which, as the trial court found, was accompanied by a manipulation of the face; (2) the removal of the cleansing cream; (3) the application of a liquid pack to the face, which, after it had dried, was washed off with cold water; and (4) after the application of a liquid powder base, the application of makeup (consisting of shadow, powder, and rouge). The above steps were

all executed by Benike, or by whatever employee was conducting the demonstration. Upon completion, the prospective customer applied her own lipstick. Although the testimony is in sharp conflict, there is ample evidence to sustain the trial court's factual determination that Benike both cleansed and manipulated the faces of the customers. The testimony is conflicting also as to how long the liquid pack was left on a customer's face during a demonstration. Sullivan admitted three minutes; other testimony indicated that on occasions it had been left on from five to twelve minutes. The prospective customer was, however, instructed to leave it on 20 minutes when applied at home. The case was tried below, and argued on this appeal, on the theory that neither defendant is licensed under the beauty culture act.

The general question presented by this appeal is whether the demonstration of cosmetics in the manner above described constitutes the operation of a beauty shop by defendant Sullivan or the practice of beautifying the human face by Benike within the meaning of the beauty culture act (§§ 155.01 and 155.02).[2] Specifically, did Sullivan

[2]The beauty culture act provides:

§ 155.01. "It shall be unlawful for any person to engage in the occupation of hairdresser and beauty culturist, or to conduct a hairdressing and beauty culture shop or school, except as hereinafter provided."

§ 155.02. "Subdivision 1. Unless the language or context clearly indicates that a different meaning is intended, the following words, terms, and phrases, for the purposes of this chapter, shall be given the meanings subjoined to them.

"Subd. 2. Any person who engages in the practice, *for compensation or other reward,* in *any one* or *any combination* of the following practices: arranging, dressing, curling, waving, cleansing, singeing, bleaching, coloring, or similar work upon the hair of any living person by any means, or hair trimming of women, as a part of women's hairdressing; *the use of cosmetic preparations,* antiseptics, tonics, *lotions, or creams, aided with the hands* or *mechanical* or electrical apparatus, or appliances used *in massaging, cleansing, stimulating, manipulating,* exercising, beautifying, the scalp, face, neck, arms, hands, bust, or upper part of the body *for the purpose of beautification,* shall be defined as and construed to be practicing hairdressing and *beauty culture.*

"Subd. 3. An 'operator' is any person who has secured a license to

occupy the status of a manager-operator and Benike the status of a beauty culture operator as defined by the statutes? Defendants further assert that, regardless of the nature of the services performed during the demonstration, the beauty culture act does not apply since the services were performed free and were not engaged in *for compensation or other reward* as provided by § 155.02, subd. 2. Defendants also contend that, if the beauty culture act is interpreted as applicable, it deprives them of due process of law and of equal protection of the law in violation of U. S. Const. Amend. XIV.

Where the words of a statute are not explicit as to its application to particular acts or conduct, or as to the meaning of any of its provisions, the intention of the legislature may be ascertained by considering, among other things, the object to be attained, the mischief to be remedied, and the consequences of a particular interpretation. § 645.16(3, 4, 6). The occupation of hairdressing and beauty culture is of the same nature as barbering since both are trades which operate directly on the person and thereby directly affect the health, comfort, and safety of the public and, as such, they are regulated under the police power. The purpose of regulating these occupations is to promote the public health and welfare by preventing the spread of contagious diseases by insuring clean and sanitary methods, procedures, and surroundings.[3] The reason for

engage in and engages in the practices defined in subdivision 2, as named within this chapter.

"Subd. 4. A 'manager-operator' is any person of legal age who owns, operates, conducts, or manages a hairdressing and beauty culture shop or school; or who instructs in practical hairdressing and beauty culture work. It shall be lawful for any person to own, operate, conduct, or manage a hairdressing and beauty culture shop or school without being licensed as a manager-operator if such person does not instruct in or practice any of the practices, as defined in subdivision 2, but does employ one or more manager-operators in the shop or school to manage same or instruct therein." (Italics supplied.)

[3]See, State v. Zeno, 79 Minn. 80, 81 N. W. 748, 48 L. R. A. 88, 79 A. S. R. 422; Luzier S. F. Laboratories v. State Board, 189 Minn. 151, 248 N. W. 664; Lee v. Delmont, 228 Minn. 101, 36 N. W. (2d) 530; Johnson v. Ervin, 205 Minn. 84, 285 N. W. 77; United Enterprises, Inc. v. Dubey (N. D. Fla.)

regulating hairdressers and beauty culturists by licensing those who may engage therein has been well stated by the trial court:

"* * * One who, with the hands, cleanses and manipulates the faces of others with cosmetic preparations and creams for the purpose of beautification should have a basic understanding of skin diseases in order to refrain from applying creams and lotions when to do so might irritate or aggravate a diseased area. Recognition of disease is also necessary in order to avoid contact with those skin conditions which might be spread and carried from one person to another through a conduit such as the person applying the cream or lotion. It is also essential for the public health that the person applying the cosmetics be free from contagious or communicable diseases of the skin, particularly on the hands, which might be spread to persons coming in contact with such person."

Clearly, when we bear in mind that the basic purpose of the beauty culture act is to prevent the spread of contagious diseases, it is apparent that the demonstrated applications of cosmetics directly to the faces of prospective customers in Sullivan's shop are activities which fall within the purview of the statute. The trial court's language is again appropriate:

"In so far as the public health and welfare are concerned, in so far as there is a danger of disease or the aggravation thereof, either (a) from the misapplication of cosmetics to particular areas of the skin or (b) from the transmittal of skin disease from one person to another by a carrier who is not able to discern such disease, or (c) from one who herself has a contagious or communicable disease, it would seem to make little or no difference whether what is given is a regular 'facial,' as that term is generally used, or a mere 'demonstration,' as an incident to the sale of cosmetics. The dangers of disease or the aggravation thereof are the same whether the creams, liquids, lotions, or other cosmetic preparations are applied and left on the face for 3 minutes or 20 minutes. Instead, what is important is that a *qualified person* perform the manual applica-

42 F. Supp. 60; Annotations, 20 A. L. R. 1111, 98 A. L. R. 1089, and 79 A. L. R. 1126; 7 Am. Jur., Barbers and Beauty Specialists, § 2.

tion—i.e., one who is free from disease herself and who is able to recognize skin diseases in others. Defendant Benike and the other employees of defendant Sullivan applied creams and lotions to the faces of hundreds or thousands of prospective cosmetic customers. There was no selectivity of potential purchasers. Anyone who wanted a 'demonstration' received one. There is no evidence that defendant Benike or the other employees in the studio had any knowledge of dermatology or the basic principles of sanitation and sterilization or that they themselves were free from contagious disease. Persons who come to a studio and receive free 'demonstrations' incidental to the purchase of cosmetics run the same risk as those who receive the usual facial in a regular beauty shop at the hands of an unlicensed 'operator.' The public must be protected as much in the one case as in the other."

Not only do the demonstrated applications of cosmetic preparations fall within the purpose of the act, but the practices followed in such demonstrations are expressly enumerated in § 155.02, subd. 2, as follows:

"Any person who engages in the practice, for compensation or other reward, in any one or any combination of the following practices: * * * *the use of cosmetic preparations,* antiseptics, tonics, *lotions, or creams, aided with the hands* or mechanical or electrical apparatus, or appliances used *in massaging, cleansing, stimulating, manipulating,* exercising, beautifying, the scalp, face, neck, arms, hands, bust, or upper part of the body *for the purpose of beautification,* shall be defined as and construed to be practicing hairdressing and *beauty culture.*" (Italics supplied.)

The fact that Sullivan's studio was not equipped with all the accepted appliances of a modern beauty shop we deem of little evidentiary significance. Obviously the art of beautification can be practiced to some extent even though many of the usual gadgets are missing.

 Since the Sullivan shop practices fall within both the purpose and the descriptive language of the statute, we next turn to the contention that these practices are, nevertheless, beyond the scope of the act because the prospective customers paid nothing for the

demonstrations. We cannot agree with this contention since it has no foundation whatever in the statutory language. Section 155.02, subd. 2, by express language applies to any person who engages, *for compensation or other reward,* in any of the practices enumerated therein, and the language thereof does not restrict such compensation or reward to any particular source. The evidence herein shows that Sullivan paid Benike seven dollars a day plus five percent commissions on sales. The trial court could reasonably find that at least a part of the seven dollars was for demonstration work. In any event, either the daily wage, or the sales commission earned, is sufficient to constitute the statutory compensation or other reward. We came to the same conclusion in Luzier S. F. Laboratories v. State Board, 189 Minn. 151, 154, 248 N. W. 664, 665, wherein we held that a demurrer to the state board's answer was properly overruled; the answers specifically alleged that the compensation was in the form of sales commissions.

We have not overlooked the fact that c. 155 formerly contained a proviso:

"* * * that no provision of this act shall in any manner be construed to apply to manufacturers of cosmetics, or their representatives or employees."

This exclusionary proviso was originally enacted as an amendment to what is now § 155.02 (L. 1933, c. 264, § 1). Subsequently in 1945 the proviso was set apart as a separate section and was amended so that the beauty culture act would be *expressly* applicable to manufacturers or their representatives or employees *who engaged in beauty culture as defined in § 155.02, subd. 2* (L. 1945, c. 191, § 8).[4] Finally in 1951 (L. 1951, c. 681, § 7) the legislature repealed the proviso in its entirety when § 155.02 and other related sections were amended to expressly cover, define, and provide for the licensing of demonstrators before student and other beauty culture groups. The

---

[4]Other states have specifically provided for the exclusion of cosmetic manufacturers and their employees from the operation of their statutes. See, *e.g.,* Deering's California Codes Ann., Business and Professions, § 7323; Colorado Rev. Stat. 1953 Ann. 32-1-5; Oregon Compiled Laws Ann. § 51-102.

only significance to be attached to the 1951 repeal is that the legislature recognized that the proviso no longer served any purpose.

■ The charge upon which Sullivan was convicted is based on § 155.02, subd. 4. Under that section any person of legal age is permitted to own, operate, conduct, or manage a beauty culture shop *without a license* if (1) such person does not personally engage in the practice of hairdressing and beauty culture as defined in § 155.02, subd. 2, and if (2) such person employs a *manager-operator* to manage the shop. Although upon a literal reading of the section there exists some ambiguity as to whether a manager-operator is required to be licensed, such requirement is indicated upon a reading of the section as a whole. For example, subd. 3 defines an "operator" as "any person who has secured a license to engage in * * * the practices defined in subdivision 2, * * *." Subd. 4 defines a "manager-operator" as "any person of legal age who owns, operates, conducts, or manages a * * * beauty culture shop * * *." Since an operator is defined as any person who is licensed under the act, it would be unreasonable to presume that merely by prefixing the word "manager" to the word "operator" it was intended to dispense with the requirement of a license. We must not overlook that it is the duty of the courts, even where a legislative act is imperfectly drawn, to ascertain the legislative purpose from a consideration of the act as a whole and to interpret it, if possible, so that it will accomplish that purpose. Judd v. Landin, 211 Minn. 465, 1 N. W. (2d) 861.

■ We need not consider whether Sullivan received any statutory compensation or other reward since she was not charged with engaging in the practice of beauty culture. She was only charged with operating and managing a beauty culture shop without first having obtained a license so to do and without employing one or more manager-operators to manage the same, all in violation of § 155.01. A careful reading of § 155.01, as modified by § 155.02, subd. 4, indicates that the manager of a beauty shop, whether she is the owner or merely an employee, must be a person who is licensed to engage in the practice of beauty culture for compensation or other reward, but nothing in either of these two sections requires

such manager to earn or receive a compensation when she acts solely in her managerial capacity. We have no evidence that Sullivan did engage in the practice of beauty culture as defined by § 155.02, subd. 2. The evidence does, however, compel the conclusion that she managed her own shop without a license and that she did not employ a licensed manager-operator as defined by § 155.02, subd. 4. Taking the act as a whole, the operation and management of a shop, by a person who is not a licensed operator and who does not employ a licensed operator as a manager, constitutes a violation of the act *if any employee or other person therein practices beauty culture for compensation. In other words, in order to establish a violation of the act, the element of compensation is a statutory essential only to the practice of beauty culture but not to the mere act of managing a shop wherein others are engaged in such practice for compensation.* Any other interpretation would be to attribute to the legislature an absurd intent. Obviously the legislature did not intend that a person could own and operate a beauty shop in violation of law and only have the employees, who directly practice beauty culture, liable for the violations. The requirement that a managing owner must be licensed, or if not licensed must employ a licensed operator as manager, is consistent with the basic statutory purpose of safeguarding public health. It is in the interest of the public that a beauty culture shop be managed by a person who has knowledge of the fundamental health and sanitation measures necessary to prevent the spread of contagious diseases.

■ Defendants seek comfort in the proposition that the state cannot, under the guise of protecting the public, *arbitrarily* interfere with private business or prohibit lawful occupations or impose *unreasonable or unnecessary* restrictions upon them. We find no arbitrary or unreasonable regulations herein. What we said in Lee v. Delmont, 228 Minn. 101, 112, 36 N. W. (2d) 530, 538, is applicable here:

"Clearly, the statutory provisions involved herein reasonably tend to accomplish the purpose of safeguarding the public health and welfare without going beyond the reasonable demands of the occasion.

We find no contravention of U. S. Const. Amend. XIV, or Minn. Const. art. 1, §§ 2 and 7. Persons, and their rights of liberty and property, are subject to the restraints and burdens which the legislature imposes upon them for the common good, and, although the exercise of a police power may inconvenience an individual or group and may curtail the use, or depreciate the value of property, if the measure reasonably tends to accomplish the purpose of its enactment without unreasonably or arbitrarily exceeding the needs of the occasion, it is a valid exercise of the police power."[5]

In concluding that the practices employed by defendants in their sales demonstrations constitute the practice of beauty culture, we have not overlooked decisions of certain other jurisdictions to the contrary. We do not concur in the reasoning of such decisions and reject them. See, Board of Cosmetological Examiners v. Gibbons, 238 Ala. 612, 193 So. 116; State ex rel. Wayman v. Johnson, 156 Kan. 191, 131 P. (2d) 660.

The order of the trial court is affirmed.

Affirmed.

---

[5]See, State ex rel. Pavlik v. Johannes, 194 Minn. 10, 259 N. W. 537; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. ed. 112, 32 L.R.A.(N.S.) 1062, Ann. Cas. 1912A, 487; 3 Dunnell, Dig. (3 ed.) §§ 1603, 1604; 11 Am. Jur., Constitutional Law, §§ 259, 261; United Enterprises, Inc. v. Dubey (N. D. Fla.) 42 F. Supp. 60; United Enterprises, Inc. v. Dubey (5 Cir.) 128 F. (2d) 843.