**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0090**

In the Matter of the Application for
Licensure of Nadeen Griepentrog.

**Filed December 12, 2016
Affirmed
Jesson, Judge**

Department of Health
OAH Docket No. 11-0900-31985

Geoffrey P. Jarpe, Jesse D. Mondry, Kristian C.S. Weir, Maslon LLP, Minneapolis, Minnesota (for relator)

Cody M. Zustiak, Assistant Attorney General, St. Paul, Minnesota (for respondent Department of Health)

Anthony B. Sanders, Meagan A. Forbes, Lee U. McGrath, Institute for Justice, Minneapolis, Minnesota (for amicus curiae Institute for Justice)

Considered and decided by Jesson, Presiding Judge; Stauber, Judge; and Reyes, Judge.

### S Y L L A B U S

The supervision requirement of Minnesota Statutes section 146B.03, subdivision 4(4) (2014), which requires 200 hours of supervision by a licensed Minnesota body-art technician for occupational licensing as a body-art technician in Minnesota, is not unconstitutional on the grounds that it unlawfully delegates legislative power, violates principles of equal protection, or violates the Dormant Commerce Clause.

# O P I N I O N

**JESSON**, Judge

Relator challenges an order denying her application for a license as a body-art technician, arguing that the supervision requirement in the body-art licensing statute, Minnesota Statutes section 146B.03, which requires supervision by a licensed Minnesota body-art technician, is unconstitutional. Because the statutory requirement does not unlawfully delegate legislative power to set licensing standards to private body-art technicians, does not violate equal-protection rights by intentionally discriminating against out-of-state technicians, and does not violate the Dormant Commerce Clause by discriminating against out-of-state commercial interests without a legitimate purpose, we affirm.

## FACTS

Relator Nadeen Griepentrog, who lives in Wisconsin, has been a licensed cosmetologist for ten years. In 2010, she took a 50-hour course in Wisconsin to learn micropigmentation, a process by which pigment is injected underneath the skin for cosmetic effect. From 2011-2014, she took additional training sessions and received further evaluation and instruction. Her total training in micropigmentation amounted to 260 hours. She also received training in bloodborne pathogens in an approved course. After her training, she began performing eyeliner, eyebrow, full lip, and lip-liner micropigmentation procedures in Wisconsin, averaging about three procedures per month.

2

In September 2014, Griepentrog, who wished to practice micropigmentation in the Twin Cities, applied to the Minnesota Department of Health (MDH) for a body-art-technician license under the body-art licensing statute. Minn. Stat. §§ 146B.01-.10 (2014). Under that chapter, among other requirements, a person seeking licensure in Minnesota to perform body art, which includes micropigmentation and other forms of tattooing, must provide proof of "a minimum of 200 hours of supervised experience within each area for which the applicant is seeking a license." Minn. Stat. § 146B.03, subd. 4(4). "Supervision" is defined as "the physical presence of a technician licensed under this chapter while a body art procedure is being performed." Minn. Stat. § 146B.01, subd. 28 (2014).[1]

Griepentrog initially submitted an incomplete application. MDH wrote back that she needed to submit the licensing fee and apply first for a temporary body-art-technician license and that the department did not accept reciprocity from Wisconsin. *See* Minn. Stat. § 146B.03, subd. 7 (allowing temporary, one-year license on application and a letter from a licensed technician who has agreed to provide the required supervision). It also

---

[1] The statutory licensing scheme was amended in 2016 to provide that "supervision" may include either "direct" or "indirect" supervision. 2016 Minn. Laws ch. 179, § 19 (amending Minn. Stat. § 146B.01, subd. 28). "Indirect supervision" means that "a licensed technician is physically present in the establishment while a body art procedure is being performed by the temporary licensee." *Id.* The licensing requirements have also been slightly modified to require provision of "a log showing the completion of the required supervised experience . . . that includes a list of each licensed technician who provided the required supervision." *Id.* (amending Minn. Stat. § 146B.03). Because an analysis under the amended statute may affect Griepentrog's matured rights, we review this case under the 2014 statute. *See McClelland v. McClelland*, 393 N.W.2d 224, 226-27 (Minn. App. 1986) (stating that this court applies the law currently in effect unless doing so would alter the matured rights of a party), *review denied* (Minn. Nov. 17, 1986).

sent her a nonexclusive list of six body-art technicians willing to provide supervision to reach the 200-hour requirement for licensing in Minnesota. *See* Minn. Stat. § 146B.03, subd. 4(4). Griepentrog attempted to contact most of those technicians about the training they offered, but she decided not to use their services because two were located in northern Minnesota, one was retired, and one was willing to provide training in the Twin Cities, but would charge $1,500.

Griepentrog requested an administrative hearing, alleging that she met all of the requirements for licensure in Minnesota, including the required hours of training, except that her training instructor was licensed in Wisconsin, rather than Minnesota. She further alleged that Minnesota Statutes section 146B.03 was unconstitutional. MDH rejected the request for hearing as premature because it had not actually denied Griepentrog's incomplete application and informed her that she could still apply for a temporary license. When she declined to do so, MDH officially denied her application for a permanent license.

MDH and Griepentrog filed cross-motions for summary disposition with the office of administrative hearings. After a hearing, an administrative-law judge issued an order recommending that the Minnesota Commissioner of Health grant MDH's motion for summary disposition. The administrative-law judge determined that Griepentrog's training did not meet the requirements of chapter 146B because it was not performed under the supervision of a Minnesota licensee and that, because she had been physically supervised for only 12 hours, her supervised experience fell short of the statutory

4

requirement.[2]  The administrative-law judge determined that, although the agency lacked authority to address Griepentrog's constitutional arguments, they were preserved for appeal.

The commissioner issued a decision affirming the denial of  Griepentrog's licensure.  The commissioner determined that the undisputed facts demonstrated that Griepentrog failed to meet the statutory requirements for licensure and that her constitutional challenges to the body-art-technician licensing statute were not properly before the agency.  Griepentrog filed this certiorari appeal.

## ISSUES

I.      Does Minnesota Statutes section 146B.03 unlawfully delegate legislative power to private parties?

II.     Does Minnesota Statutes section 146B.03 violate principles of equal protection?

III.    Does Minnesota Statutes section 146B.03 violate the Dormant Commerce Clause?

## ANALYSIS

Griepentrog challenges the constitutionality of Minnesota Statutes section 146B.03 on three different grounds.  First, she argues that the statute represents an unlawful delegation of legislative authority because it delegates legislative power to private persons, i.e., current Minnesota body-art-technician licensees who act as

---

[2] Griepentrog's micropigmentation trainer stated in a deposition that she had physically supervised Griepentrog performing procedures for 12 of the 260 hours of Griepentrog's training.  The trainer stated that she also spent about 20 hours with Griepentrog going over pictures of work that she had performed and that Griepentrog's other training hours were classroom hours.

supervisors to applicants for licensure.  Next, she argues that the statute denies equal-protection rights under the Minnesota Constitution by discriminating against out-of-state body-art technicians who have training and experience similar to that of Minnesota licensed technicians.  Finally, she argues that the statute violates the Dormant Commerce Clause of the United States Constitution because it impermissibly discriminates against interstate commerce.

Griepentrog's allegations lead us to the heart of the state's ability to protect the public through licensure.  This power to regulate occupations was first invoked in the nineteenth century through licensure of the professions of law and medicine.  *See Dent v. West Virginia*, 129 U.S. 114, 124, 9 S. Ct. 231, 234 (1889) (upholding state licensing statute for physicians).  Using its police power, states mandated that a professional must meet particular qualifications in order to obtain a license to practice certain occupations.  And those licenses were subject to suspension, revocation or other disciplinary action if a licensee did not meet certain standards of practice.  As the United States Supreme Court noted in explaining the power of the state to provide for the welfare of its people:

> [I]t has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely; their possession being generally ascertained upon an examination of parties by competent persons or inferred from a certificate to them in the form of a diploma.

*Id*. at 122, 9 S. Ct. at 233.

When determining who gained entrance to a profession through the grant of a license, as well as when disciplinary action against licensed professionals was

6

appropriate, states leaned heavily upon professional participation. *See generally*, Paul Starr, *The Social Transformation of American Medicine*, at 102-03 (1982) (discussing the growth of the medical profession). Licensure was often implemented by state boards, which were dominated by members of the licensed professions to such an extent that lines blurred, at times, between state and professional self-regulation.[3]

At the beginning of the 1900s, licensing power was extended in many states beyond medicine and law to require licensure for persons engaged in other occupations, including plumbers, barbers, funeral directors, nurses, electricians, and dentists. Lawrence M. Friedman, *Freedom of Contract and Occupational Licensing 1890-1910: A Legal and Social Study*, 53 Calif. L. Rev. 487, 489 (1965); *see, e.g.*, *State v. Zeno*, 79 Minn. 80, 83-85, 81 N.W. 748, 749-51 (1900) (concluding that licensing statute for barbers, which required training and experience to perform that trade, was constitutional, citing public-health considerations). In 2010, Minnesota took a step further, joining numerous other states in requiring licensure of body-art-technicians. *See* 2010 Minn. Laws ch. 317, §§ 1-12, at 864-878.

In examining Griepentrog's constitutional challenge to this law, this court applies a de novo standard of review. *Gluba ex rel. Gluba v. Bitzan & Ohren Masonry*, 735 N.W.2d 713, 719 (Minn. 2007). We presume that Minnesota statutes are constitutional, and we will declare a statute unconstitutional only "with extreme caution and only when absolutely necessary." *Id.* The party challenging the statute has the burden to establish

---

[3] The extent of professional participation in licensure has drawn criticism for serving the interests of professions rather than the public. *See* Carl F. Ameringer, *State Medical Boards and the Politics of Public Protection* (1999); *see generally* Starr, *supra*, at 17-29.

beyond a reasonable doubt that the statute violates a constitutional right. *IHLC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 421 (Minn. 2005). We conclude that Griepentrog has not sustained her burden to demonstrate that Minnesota Statutes section 146B.03 is unconstitutional under any of three articulated theories.

> **I.     Minnesota Statutes section 146B.03 (2014) is not an unlawful delegation of legislative power.**

Griepentrog first argues that the supervisory requirement in Minnesota Statutes section 146B.03 amounts to an unconstitutional delegation of legislative authority to private parties—in this case, licensed Minnesota body-art technicians. The United States Supreme Court has held that the liberty component of the Due Process Clause in the Fourteenth Amendment to the United States Constitution includes the general right to choose a field of private employment. *Conn v. Gabbert*, 526 U.S. 286, 291-92, 119 S. Ct. 1292, 1295-96 (1999). But this right is subject to reasonable government regulation. *Id.* at 1292, 119 S. Ct. at 1296. Thus, a state may regulate liberty and property rights for the common good, and the state's exercise of police power through regulation of lawful occupations is valid if it "reasonably tend[s] to accomplish the purpose of safeguarding the public health and welfare without going beyond the reasonable demands of the occasion." *State v. Sullivan*, 245 Minn. 103, 113, 71 N.W.2d 895, 901 (1955) (quotation omitted).

Griepentrog, however, argues that by imposing a requirement that an applicant for a body-art-technician license in Minnesota must be supervised by a licensed Minnesota body-art technician, the state has unconstitutionally delegated its legislative authority to

private parties, who may operate in their own self-interest to exclude qualified practitioners from the field. Griepentrog asserts the unlawful-delegation doctrine applied by the United States Supreme Court in *Carter v. Carter Coal Co.*, 298 U.S. 238, 311-12, 56 S. Ct. 855, 872-73 (1936). In *Carter Coal Co.*, the Supreme Court held that a federal act authorizing a local coal-district board to set agreed-on prices for coal unconstitutionally delegated federal governmental power to private parties, who were interested in the outcome of a business transaction. *Carter Coal Co.*, 298 U.S. at 311-12, 56 S. Ct. at 872-73. The Supreme Court also held that a municipal ordinance, which allowed two-thirds of abutting property owners to establish a building line on the abutting property, was an unreasonable exercise of police power because it conferred power on some property owners to control the rights of other property owners. *Eubank v. City of Richmond*, 226 U.S. 137, 143-44, 33 S. Ct. 76, 77 (1919). The unlawful-delegation doctrine as applied to occupational licensing posits an argument that certain state regulation confers government power on private parties who are not required to safeguard constitutional rights, allowing the government to avoid accountability by failing to protect those rights. *See generally* Paul J. Larkin, Jr., *Public Choice Theory and Occupational Licensing*, 39 Harv. J. L. & Pub. Pol. 209, 312, 319-20 (2016).

To review Griepentrog's claim on this issue, we first examine applicable Minnesota caselaw on the doctrine of unlawful delegation. We then analyze the supervision requirements of section 146B.03 in light of that law, addressing Griepentrog's arguments on the lack of standards in the statute and the alleged power of existing body-art technicians to deny licensure. We conclude, based on this analysis, that

9

Minnesota Statutes section 143B.03 is not an unconstitutional delegation of legislative power.

### *Minnesota precedent on unlawful delegation*

The Minnesota Supreme Court held in 1949 that, unless expressly authorized by the constitution, "the legislature . . . cannot delegate purely legislative power to any other body, person, board, or commission." *Lee v. Delmont*, 228 Minn. 101, 112, 36 N.W.2d 530, 538 (1949). In *Lee*, the supreme court defined "[p]ure legislative power" as "the authority to make a complete law," including the time the law takes effect and to whom it applies. *Id.* at 113, 36 N.W.2d at 538. The supreme court held, however, that the legislature may confer on a board or commission the discretionary power to ascertain operative facts and apply the law. *Id.* Such delegation is not legislative if the law provides "a reasonably clear policy or standard of action." *Id.* at 113, 36 N.W.2d at 538-39. If this test is met, the delegation of power is not unconstitutional. *See id.*

Applying the test in *Lee*, the supreme court invalidated as an unconstitutional delegation of legislative authority a nonsigner provision of the Minnesota Fair Trade Act, which bound nonsigning retailers to prices that had been agreed upon by other retailers in their contracts. *Remington Arms Co. v. G.E.M. of St. Louis, Inc.*, 257 Minn. 562, 569, 102 N.W.2d 528, 533 (1960). The supreme court noted that the relevant act provided "no standard or yardstick" by which to determine prices and granted a private party the ability to create a right of action for its own benefit without a hearing to protect consumer or nonsigning-retailer rights. *Id.* at 572, 102 N.W.2d at 535. The supreme court also applied the non-delegation doctrine to invalidate a statutory provision that conditioned

10

rezoning on the consent of two-thirds of the property owners whose property lay within 100 feet of the proposed rezoning. *Foster v. City of Minneapolis*, 255 Minn. 249, 254, 97 N.W.2d 273, 276 (1959).

More recently, however, the supreme court has declined to apply the doctrine of unconstitutional delegation in several situations. It held that the doctrine did not invalidate a sports facilities commission's authority to sell or lease advertising in a sports stadium on an exclusive basis. *Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 381 N.W.2d 842, 847-48 (Minn. 1986). In *Hubbard Broad.*, the supreme court noted that the commission delegated only a ministerial duty to the party who was awarded exclusive advertising rights. *Id.* The supreme court has also held that a statute restricting a unilateral reduction in teachers' benefits without union approval did not amount to an unconstitutional delegation of legislative power because it did not grant authority to create or apply restrictions, but only discretion to determine whether to waive an existing restriction. *West St. Paul Fed'n of Teachers v. Indep. Sch. Dist. No. 197*, 713 N.W.2d 366, 376-77 (Minn. App. 2006).

Two important guiding principles are drawn from these cases. First, if the legislature may properly perform certain acts, but it is not convenient or advantageous for it to do so, it may authorize others to perform those acts. *Remington Arms*, 257 Minn. at 570, 102 N.W.2d at 534. Second, the distinction between properly conferring authority or direction and improperly delegating legislative powers depends on whether a statute gives a private party "the arbitrary right to exercise an option to make a law operative on its own terms." *Id*. In reviewing Griepentrog's challenge, we therefore examine whether

11

Minnesota Statutes section 146B.03 creates such an arbitrary right, or whether it imposes sufficient standards and safeguards so as "to protect against the injustice that results from uncontrolled discretionary power." *Hubbard Broad.*, 381 N.W.2d at 847. We first address Griepentrog's argument that the statute does not impose sufficient standards for licensing body-art technicians. We then examine whether the statute improperly allows current body-art technicians to control access to the occupation by granting them the power to deny licensure to prospective licensees.

### *Lack of standards*

We note initially that a supervision requirement for licensing body-art technicians is not unique to this occupation. Under current Minnesota law, the regulation of numerous professions and trades includes statutory requirements for supervision to obtain licensure. For instance, to obtain a license as a midwife, a person must have "supervised participation in 20 births," as well as "participation as the primary birth attendant under the supervision of a licensed traditional midwife at an additional 20 births." Minn. Stat. § 147D.17, subd. 1(6)(ii), (iii) (2014). To become a certified licensed psychologist in Minnesota, a person must meet requirements that include one year of supervised employment following a master's or doctoral degree. Minn. Stat. § 148.907, subds. 2, 3 (2014). Supervision takes the form of "documented, in-person consultation" by a qualified mental-health professional. Minn. Stat. § 148.925, subd. 1 (2014). A person who wishes to obtain a license to practice mortuary science is required to "complete a registered internship under the direct supervision of an individual currently licensed to practice mortuary science in Minnesota." Minn. Stat. § 149A.20, subd. 6(a) (Supp.

2015).  And a person who is a registered barber apprentice may practice barbering only if that person is "at all times under the immediate personal supervision of a registered barber."  Minn. Stat. § 154.03 (2014).  These requirements of supervised experience for licensure to perform certain occupations reflect the intertwined nature of professional self-regulation and state regulation through licensure.

Griepentrog argues that the supervision experience required by section 146B.03 overreaches because it provides no standards and allows existing licensees to act as "gatekeepers" to deny access to licensure in Minnesota.  It is true that section 146B.03 does not contain specific standards relating to the 200 hours of required supervision.  But we may review the content of the statute to discern its meaning in its full-act context and "consider sections that relate to the same subject matter."  *A.A.A. v. Minn. Dep't of Human Servs.*, 818 N.W.2d 552, 556 (Minn. App. 2012), *aff'd*, 832 N.W.2d 816, 825 (Minn. 2013).  Chapter 146 contains health and safety standards for body-art facilities, instruments, and supplies, as well as cleanliness and sanitation requirements for body-art procedures.  *See* Minn. Stat. § 146B.06.  Technicians are required to comport with these procedures.  *Id*., subd. 4.  In addition, the statute requires informed consent from a person seeking body art and prohibits the administration of body art on a person under the age of 18.  Minn. Stat. § 146B.07, subds. 2-3.  Construing section 146B.03 in conjunction with sections 146B.06 and 146B.07, we conclude that, taken together, these sections evince a legislative intent that a licensed body-art technician must comport with specified public-health and safety regulations when supervising a prospective licensee and seek to instill these standards in the trainee.  *See A.A.A.*, 818 N.W.2d at 556.

This construction of the statute is supported not only by a reading of the body-art statute as a whole, but by its legislative history as well. *See* Minn. Stat. § 645.16 (7) (2014) (permitting consideration of contemporaneous legislative history to ascertain legislative intent). Here, the legislative history indicates a broad public-health-related goal of increasing the pool of eligible blood donors. Hearing on H.F. 677 Before the H. Finance Comm. (Apr. 9, 2010) (statement of Rep. Bunn). The Red Cross and the state's blood banks had experienced a decline in blood donations, and they had a policy of not allowing blood donation from persons who had received a tattoo in the last 12 months, based on the lack of state-wide regulation in body-art establishments to assure proper client education, blood handling, and sterilization. *Id*. By regulating the performance of body art in Minnesota, the legislature hoped to increase the pool of eligible blood donors because many young people were receiving tattoos. *Id*.

Examining all of these considerations, we conclude that the supervision requirement in section 146B.03 is related to the legitimate state purpose of safeguarding public health and welfare. *See Sullivan*, 245 Minn. at 113, 71 N.W.2d at 901. And, unlike the delegation determined to be unlawful in *Foster* and *Remington Arms*, the statute contains sufficient standards to guide the exercise of authority by the licensed body-art technicians. We also note that MDH retains the ability to control the body-art trade by disciplining licensees for a number of infractions, including demonstrating a willful or careless disregard for a client's welfare, health, or safety. Minn. Stat. § 146B.08, subd. 3 (2014). This power is an additional safeguard that protects against uncontrolled power by current licensees. *See Hubbard Broad.*, 381 N.W.2d at 847. We

14

therefore reject Griepentrog's argument that the statutory supervision requirement delegates legislative power to current licensees without imposing appropriate standards.

### *Delegation of authority to existing technicians*

In addition, Griepentrog maintains that the supervisory requirement in section 146B.03 delegates excessive power to existing body-art technicians licensed in Minnesota because those technicians will conspire to prevent out-of-state technicians from becoming licensed in this state. And she asserts that our analysis of this issue should be driven by cases in other jurisdictions holding the regulation of certain occupations to be an unlawful delegation of legislative power. We address these issues in turn.

Griepentrog argues that the statute amounts to an unconstitutional delegation of power because it gives current licensed body artists the right to deny licensure. She maintains that a current licensee may decline to sign the required affidavit certifying that an applicant has completed the 200-hour supervision requirement. But the requirement of signing the affidavit is a ministerial task, which is routinely performed after the supervision requirement is completed. *See Hubbard Broad.*, 381 N.W.2d at 848 (holding that sports facilities commission was not an unconstitutional delegation because it delegated only a ministerial function to sell or lease advertising on a stadium scoreboard). It does not confer power on existing body-art technicians to determine the level of competence of license applicants or define what level of competence is required for licensure.

15

Griepentrog further maintains that an individual body-art licensee has undue power because that person may decline to supervise a license applicant or may charge for supervision. But these prerogatives, as in other occupations, do not render the statute an unconstitutional delegation of power because an applicant may choose from many licensed body-art technicians for supervision, and the marketplace controls rates for supervision.[4] And to the extent that Griepentrog argues that licensees may conspire together to deprive her of the opportunity to practice body art, if this occurred, she would be able to seek a remedy for restraint of trade under the Sherman Act, 15 U.S.C. § 1 (2012); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 362 (7th Cir. 1990) (upholding decision that national medical association had engaged in unreasonable restraint of trade by an illegal boycott against chiropractors). She also argues that potential supervisors have no incentive to offer supervision because they would be training their future competition. But it is just as likely that a current licensee would wish to supervise a license applicant in order to maintain standards within the profession and ensure the existence of a competent pool of future practitioners.[5]

Amicus curiae Institute for Justice cites cases from other jurisdictions that have struck down state regulations as violating the separation of powers or violating due

---

[4] Although MDH referred Griepentrog to only six potential supervisors, the statute permits other licensed body-art practitioners to undertake the required supervision. Minn. Stat. § 146B.03.

[5] The legislative history of the statute reflects that the Minnesota body-art community was also concerned with the variability of local standards relating to the administration of body art, so that people acquiring tattoos in unregulated counties may be exposed to health hazards. Hearing on S.F. 525 Before the Sen. Comm. on Health, Housing, and Family Security (Mar. 2, 2009) (statement of Ryan Welles, tattooist).

16

process by delegatory lawmaking power to private parties. In some of those cases, courts have invoked vesting clauses in their state constitutions to hold that a statute amounts to an unlawful delegation of legislative power.[6] *See, e.g.*, *State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 272 A.2d 478, 481 (Pa. 1971) (holding that allowing private chiropractic society to set continuing education requirements for licensed chiropractors amounted to unconstitutional delegation of power). Amicus curiae also cites cases from jurisdictions in which laws have been invalidated because private parties were given an exclusive privilege to act in their own self-interest. *See, e.g.*, *Revne v. Trade Comm'n*, 192 P.2d 563 (Utah 1948) (invalidating law that allowed majority of barber industry group to set prices and hours of barber shops).

Although the Minnesota Constitution contains vesting clauses, Minn. Const. art. III, § 1, and art. IV, § 1, we ascertain no caselaw that requires us to invalidate the supervisory requirement of Minnesota Statutes section 146B.03 based on a separation-of-powers analysis. And we note that the Minnesota scheme for body-art regulation does not give significant power to body artists relating to their occupation, such as the power to spend public funds or to establish state-wide standards affecting the group of body artists generally.[7] In fact, the supervisory requirement of section 146B.03 gives the supervising body artist no power to influence policy relating to the body-art trade.

---

[6] A vesting clause controls the allocation of power by conferring designated authority on a specific branch of government. *See* U.S. Const. art I, § 1 (conferring on Congress alone "all legislative powers herein granted").

[7] In enacting the licensure statute, legislators expressed an intent to reach the community of body-art practitioners, which was traditionally less organized than other occupations

We note that other jurisdictions have upheld licensing regulations and training for certain occupations against challenges of unconstitutional delegation. *See, e.g.*, *Trinity Med. Ctr. v. N. Dakota Bd. of Nursing*, 399 N.W.2d 835, 847 (N.D. 1987) (holding that statute granting authority to establish nursing education programs was not unconstitutionally standardless delegation of legislative authority); *Indep. Electricians & Elec. Contractors Ass'n v. New Jersey Bd. of Exam'rs of Elec. Contractors*, 256 A.2d 33, 42, (N.J. 1969) (holding that electrical contractors' occupational-licensing statute, sponsored by certain industry segments, did not unconstitutionally delegate legislative power); *Nat'l Ass'n of Forensic Counselors v. Fleming*, 759 N.E.2d 389, 393 (Ohio App. 2001) (concluding that statute deferring credentialing of chemical-dependency counselors to state board was a proper delegation of legislative power, and "a more specific expression of [credentialing] standards [in the statute] would be impractical and unnecessary"). Our analysis of Minnesota law leads to a similar result in this case.

We conclude, based on our review, that the supervision requirement in Minnesota Statutes section 146B.03 embodies a longstanding component of professional self-regulation in licensure. The required supervision incorporates the public health and safety standards set forth in the act regulating body art as a whole and is technical in nature. Because it does not amount to an unlawful delegation of legislative power, we decline to hold it unconstitutional on that basis.

---

and had no formal schools. Hearing on H.F. 677 Before the H. Finance Comm. (Apr. 9, 2010) (statement of Rep. Bunn).

18

**II.  Minnesota Statutes section 146B.03 does not violate the Equal-Protection Clause of the Minnesota Constitution.**

Griepentrog also argues that Minnesota statutes section 146B.03 violates the Equal-Protection Clause of the Minnesota Constitution. *See* Minn. Const. art. I, § 2. That provision guarantees that "all similarly situated individuals shall be treated alike." *Scott v. Minneapolis Police Relief Ass'n*, 615 N.W.2d 66, 74 (Minn. 2000). A party may assert an equal-protection challenge based either on a statute's express terms, which is a facial challenge, or based on the statute's application to a particular situation. *State v. Richmond*, 730 N.W.2d 62, 71 (Minn. App. 2007), *review denied* (Minn. June 19, 2007). A facial equal-protection challenge alleges that the statute creates at least two classes of individuals, which are treated differently under the statute, and that this difference in treatment cannot be justified. *In re McCannel*, 301 N.W.2d 910, 916 (Minn. 1980). An "as applied" challenge on equal-protection grounds alleges that the statute has been applied in an arbitrary or discriminatory manner. *Id*.

Griepentrog asserts both facial and as-applied equal-protection challenges to Minnesota Statutes section 146B.03. She argues that the statute is facially discriminatory because it treats persons who do not have 200 hours of in-state supervision differently from other applicants for licensure. And she maintains that MDH applied the supervision requirement in a discriminatory fashion to deny her a Minnesota body-art-technician license. Finally, she argues that the statute fails the rational-basis test applicable to equal-protection claims under Minnesota law. *See State v. Russell*, 477 N.W.2d 886, 889 (Minn. 1991) (stating that test). We conclude that even if Griepentrog is similarly

situated to other body-art technicians, the statute is not facially discriminatory, it does not intentionally or purposefully discriminate against her as applied, and it satisfies the relevant rational-basis test.

### *Similarly situated*

A party seeking to invalidate a statute on equal-protection grounds must initially show that he or she has been treated differently from others who are similarly situated. *Odunlade v. City of Minneapolis*, 823 N.W.2d 638, 647 (Minn. 2012); *Draganosky v. Minn. Bd. of Psychology*, 367 N.W.2d 521, 525 (Minn. 1985). The focus when determining whether groups of people are similarly situated is whether "they are alike in all relevant respects." *State v. Cox*, 798 N.W.2d 517, 522 (Minn. 2011).

Griepentrog alleges she was similarly situated to other body-art technicians receiving licenses in Minnesota because she has had equivalent experience in performing procedures. She argues that her experience and training give her the same relevant characteristics as a person practicing body art in Minnesota, based on the purpose of Minnesota Statutes section 146B.03 to protect public health and safety. And she maintains that she is being treated differently from similarly-situated candidates because she is being required to undergo 200 hours of additional supervised training.

As Griepentrog points out, in addressing recent equal-protection challenges, this court has concluded that personal-care attendants who are related to their patients are similarly situated to personal-care attendants who are not related to their patients. *Weir v. ACCRA Care, Inc.*, 828 N.W.2d 470, 473 (Minn. App. 2013); *Healthstar Home Health v. Jesson*, 827 N.W.2d 444, 449 (Minn. App. 2012). We held that the relevant statutes

denied equal protection based on a premise that they treated similarly situated personal-care attendants differently simply because of their relationship to the patients. *Id*. Griepentrog argues that her experience performing body-art procedures in Wisconsin makes her similarly situated to licensed body-art technicians in Minnesota. We are not persuaded, however, that the relevant characteristics for determining whether Griepentrog is similarly situated to Minnesota technicians relate only to experience, and not to supervision as well. It is more likely that the relevant characteristics for determining whether a person is similarly situated relate to whether a person has the similar *supervised* experience. We note, for example, that the body-art-technician statute contains a reciprocity provision, by which the commissioner may issue a technician's license to a person holding a current license, certification, or registration in another jurisdiction, if the commissioner determines that those credentials "meet or exceed the requirements for licensure stated in this chapter." Minn. Stat. § 146B.03, subd. 8. On this record, the reciprocity provision would not support granting Griepentrog a license because she had only 12 hours of supervised experience in Wisconsin, far less than the 200 hours required for a Minnesota license. Thus Griepentrog may not meet the "similarly situated" test because she lacked similar supervised experience to applicants granted a license in Minnesota.

### Facial and as-applied challenges

But even if we were to assume that Griepentrog was similarly situated to other body artists seeking licensure in Minnesota, we cannot conclude that the statute on its face or as applied treats her differently from those prospective licensees. Minnesota

Statutes section 146B.03 does not require that only Griepentrog or other out-of-state applicants have 200 hours of in-state supervision. That requirement applies equally to all applicants, including in-state applicants or any applicants who have previous experience in other states. *See* Minn. Stat. § 146B.03. Therefore, because the statute on its face treats her equally to other persons seeking licensure in this state, we reject Griepentrog's facial equal-protection challenge.

Griepentrog also argues that the state's application of the statute to prevent her licensure denied her equal protection of the law. She maintains that she was treated differently based on her qualifications and work experience only because she lacked the required supervised hours in Minnesota. But the "unequal application [of a statute] to those entitled to equal treatment is not a denial of equal protection unless intentional or purposeful discrimination is shown." *Draganosky*, 367 N.W.2d at 526 n.4 (citing *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397, 401 (1944)). In *Draganosky*, the Minnesota Supreme Court rejected a similar argument by a person who was seeking to become a licensed consulting psychologist in Minnesota. *Id.* at 525-26. The supreme court held that the denial of the applicant's request for a variance from a licensing rule, which required a doctorate from a regionally accredited institution, did not amount to a denial of equal protection, and that the applicant had failed to show that the licensing board had applied its rule in an arbitrary or discriminatory manner. *Id.*

Similarly, we conclude that Griepentrog has not shown that MDH was intentionally or purposefully discriminating against her by enforcing the 200-hour supervision requirement only against her, as opposed to other applicants. The record

22

contains no evidence that other applicants were allowed to obtain body-art licenses without fulfilling the 200-hour requirement. Griepentrog points out that the statute originally contained a grandfathering provision for previously practicing body artists. Minn. Stat. § 146B.03, subd. 10 (2012) (repealed, 2013 Minn. Laws ch. 43, § 32 at 25). That provision required at least 2,080 hours of body work practice or more than 1,040 hours, with at least six hours of approved coursework. *Id.* But Griepentrog, who was physically supervised for only 12 hours, does not contend that if she had applied for licensure during the grandfathering period and met those requirements, she would have been denied a body-art license. Therefore, we conclude that Griepentrog has failed to meet the intentional-discrimination standard for an "as-applied" equal-protection claim.

### *Rational basis test*

Finally, even if Griepentrog could proceed successfully to this stage of an equal-protection analysis under the Minnesota Constitution, we conclude that she is unable to meet the final requirement for striking down a statute when a fundamental right or suspect class is not involved: that it fails the rational-basis test. *See Russell*, 477 N.W.2d at 889. For a challenged statute to withstand rational-basis review under Minnesota law: (1) the distinctions between persons included in a classification and those not included "must be genuine and substantial, . . . providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs"; (2) "the classification must be genuine [and] relevant to the purpose of the law"; and (3) the statute's purpose "must be one that the state can legitimately attempt to achieve." *Id*. at 888 (quotation omitted). Here, the difference in classification of prospective body-art licensees between those who

23

have had the required supervised experience, and those who have not, is genuine and substantial because it promotes standards relating to health and safety in the administration of body art in Minnesota. It is relevant to that statutory purpose. And that purpose is a legitimate one for state regulation. Therefore, the statute meets the Minnesota rational-basis test, and we reject Griepentrog's equal-protection argument.

**III.**     **Minnesota Statutes section 146B.03 does not violate the Dormant Commerce Clause.**

Griepentrog also argues that Minnesota Statutes section 146B.03 violates the Dormant Commerce Clause of the United States Constitution. The Commerce Clause provides that "[t]he Congress shall have [the] power . . . [t]o regulate Commerce with foreign [n]ations and among the several States." U.S. Const. art. I, § 8, cl. 3. Although the Commerce Clause refers to an affirmative grant of power to Congress, it has long been interpreted to contain an implied negative command, called the Dormant Commerce Clause, that states may not unduly burden or discriminate against interstate commerce. *Chapman v. Comm'r of Revenue*, 651 N.W.2d 825, 832 (Minn. 2002). The constraint of the Dormant Commerce Clause reflects concerns over economic protectionism: regulatory measures that are designed to benefit in-state economic interests by burdening out-of-state competition. *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74, 108 S. Ct. 1803, 1807-08 (1988). "By prohibiting States from discriminating against or imposing excessive burdens on interstate commerce without congressional approval, it strikes at one of the chief evils that led to the adoption of the Constitution, namely, state

24

tariffs and other laws that burdened interstate commerce." *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015).

Ordinarily, in evaluating a Commerce Clause challenge, this court engages in a two-step analysis. *Chapman*, 651 N.W.2d at 832. First, we determine "whether the challenged statute implicates the Commerce Clause." *Id*. If it does, we "then evaluate whether the statute violates the Commerce Clause." *Id*. This involves determining whether the challenged law discriminates against interstate commerce or excessively burdens interstate commerce. *Swanson v. Integrity Advance, LLC*, 870 N.W.2d 90, 94 (Minn. 2015) (citations omitted). If it discriminates against interstate commerce, it is not valid unless it furthers a legitimate local purpose that cannot be adequately served by reasonable alternatives that are nondiscriminatory. *Id.* at 93. But if it "'regulates evenhandedly to effectuate a legitimate public interest'" and has only an incidental effect on interstate commerce, the law "'will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* at 94 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970)).

In two discrete subsets of cases, however, courts employ a different test. *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1171 (10th Cir. 2015). First, legislation that clearly discriminates against out-of-state interests is usually a per se violation of the Dormant Commerce Clause, unless the discrimination is justified by a factor that is not related to economic protectionism. *Id*. at 1171-72 (citations omitted). Second, state legislation that directly controls commerce totally outside its border is likely to be invalid per se. *Id.* Certain price-control laws and price-affirmation laws controlling

extraterritorial conduct—conduct that occurs outside the borders of a state—may also be deemed per se invalid. *Id.* (citations omitted). This second subset is referred to as the "extraterritoriality doctrine." *North Dakota v. Heydinger*, 825 F.3d 912, 919 (8th Cir. 2016). It is "the most dormant" doctrine in Dormant Commerce Clause jurisprudence. *Energy & Env't Legal Inst.*, 792 F.3d at 1172. The United States Supreme Court has only relied upon the extraterritoriality doctrine to justify a holding in the context of price-control laws, although lower courts have used it to invalidate statutes regulating state environmental laws and the Internet. David M. Driesen, *Must the States Discriminate Against Their Own Producers Under the Dormant Commerce Clause?,* 54 Houston L. Rev. 1, 20-22 (2016); *see, e.g.*, *Heydinger*, 825 F.3d at 921-22 (holding that provisions of the Minnesota Next Generation Energy Act, Minn. Stat. §§ 216H.01-.13 (2014), which established energy and environmental standards related to carbon dioxide emissions, violated or were preempted by federal law and violated the Dormant Commerce Claus under extraterritoriality doctrine).

MDH urges this court to apply the extraterritoriality doctrine in examining the application of the commerce clause in this case, citing *Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S. Ct. 2491, 2499 (1989), a case referring to that doctrine. MDH argues that, under this analysis, the Dormant Commerce Clause is inapplicable because the licensure requirements do not affect any commerce that takes place outside of Minnesota.

MDH misinterprets the interaction between the extraterritoriality doctrine and the traditional Dormant Commerce Clause analysis. The extraterritoriality doctrine applies only when its narrow parameters are met; when a law, typically price regulation, controls

26

commerce totally outside its borders. In those rare cases, courts will strike down state laws as violating the Dormant Commerce Clause. *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-22, 55 S. Ct. 497, 499-500 (1935) (striking down act prohibiting dealer from selling, in the state, milk produced out of state, at less than minimum price fixed for similar milk produced within the state); *see also Heydinger*, 825 F.3d at 922 (noting that challenged portions of statute had practical effect of controlling activities taking place wholly outside of Minnesota). But if a case does not fit into those narrow confines, our work is not complete, and the traditional Commerce Clause analysis is appropriate. *Swanson*, 870 N.W.2d at 94.

Here, the supervision requirement in section 146B.03, does not fall within the narrow category of laws subject to analysis under the extraterritoriality doctrine. It does not apply to commerce wholly outside of Minnesota. Indeed, the focus of the statute addresses conduct within its borders. It does not address price controls or price affirmations. *See Energy & Env't Legal Inst.*, 793 F.3d at 1174. Therefore, we must inquire further and examine Griepentrog's argument under a traditional Commerce Clause analysis.

### *Whether the statute implicates the Commerce Clause*

Under that analysis, a statute may implicate interstate commerce if it affects out-of-state economic interests that may wish to conduct in-state operations. *See Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 107, 114 S. Ct. 1345, 1354 (1994) (holding that Oregon's facially discriminatory surcharge on waste material generated in other states invalid under Dormant Commerce Clause). Here Griepentrog, who lives in another

27

state, wishes to practice body art in Minnesota. As a result, under the traditional analysis, Minnesota's regulation on supervision for licensing body-art technicians implicates interstate commerce. *See, e.g.*, *Serv. Mach. & Shipbldg. Corp. v. Edwards*, 617 F.2d 70, 73-76 (5th Cir. 1980) (striking a city ordinance that required only nonresident itinerant laborers to register their employment as unconstitutional under Dormant Commerce Clause because "[t]he movement of persons falls within the protection of the commerce clause").

### *Burden on interstate commerce*

Even if a licensing scheme implicates interstate commerce, however, in order to be held invalid under the Dormant Commerce Clause, it must also discriminate against or excessively burden interstate commerce. A statute discriminates against interstate commerce if it accords "differential treatment [to] in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste*, 511 U.S. at 99, 114 S. Ct. at 1350. This discrimination may occur in one of three ways: either the statute is facially discriminatory, it has a discriminatory intent, or it has an effect of unduly burdening interstate commerce. *Mayo Collaborative Servs., Inc. v. Comm'r of Revenue*, 698 N.W.2d 408, 412 (Minn. 2005). Griepentrog first argues that the supervision requirement in Minnesota Statutes section 146B.03 discriminates on its face between in-state and out-of-state applicants for body-art-technician licensure. She does not argue that the statute was motivated by a discriminatory intent. But she also argues that, even if it is not facially discriminatory, the statute has the effect of unduly burdening interstate commerce

Minnesota Statutes section 146B.03 does not discriminate on its face between in-state applicants for licenses and out-of-state applicants for licenses: both categories of applicants are required to receive 200 hours of training by a Minnesota-licensed technician. Because the statute has the same requirements for both in-state and out-of-state prospective licensees, Griepentrog's facial-discrimination claim lacks merit.

Griepentrog also argues that, even if not facially discriminatory, the licensure requirement unduly burdens interstate commerce because an out-of-state applicant who wishes to obtain a Minnesota license is required to travel to Minnesota and obtain 200 hours of training there. She maintains that she is particularly burdened by this requirement because she has already received training in Wisconsin and is proficient in micropigmentation.

A constitutional burden under the Dormant Commerce Clause "refers to a hindering of the interstate commercial system." *Studor, Inc. v. State*, 781 N.W.2d 403, 411 (Minn. App. 2010) (quotation omitted), *review denied* (Minn. July 20, 2010). A statute generally does not discriminate against interstate commerce if it regulates evenhandedly, with only incidental effects on interstate commerce. *Or. Waste*, 511 U.S. at 99, 114 S. Ct. at 1350. And if a nondiscriminatory regulation has only incidental effects on interstate commerce, that regulation is valid unless the burden imposed is "'clearly excessive in relation to the putative local benefits.'" *Studor, Inc.*, 781 N.W.2d at 411 (quoting *Pike*, 397 U.S. at 142, 90 S. Ct. at 847).

We note that courts in other jurisdictions have upheld the regulation of other occupations against Dormant-Commerce-Clause arguments. *See, e.g.*, *Kirkpatrick v.*

29

*Shaw*, 70 F.3d 100, 103 (11th Cir. 1995) (holding that Florida state bar's character and fitness requirement for attorneys did not violate Dormant Commerce Clause); *Excelsior Coll. v. Cal. Bd. of Registered Nursing*, 39 Cal. Rptr. 3d 618, 630 (Cal. Ct. App. 2006) (holding that alleged burden on out-of-state college whose distance learning program did not comply with California nursing-program requirements was clearly outweighed by benefit to state citizens of insuring a minimum level of competency in nurses).

We similarly conclude that the supervision requirement of Minnesota Statutes section 146B.03 does not excessively burden interstate commerce when weighed against the benefit to the public welfare of insuring competency in body artists practicing in this state. Minnesota is not alone in requiring supervision of prospective body-art licensees.[8] And as discussed above, the supervision provision in chapter 146B furthers the state purpose of ensuring that license applicants receive training by a current licensee who observes state-approved health and safety standards.

Nor is the burden on a prospective licensee from out of state excessive. The Minnesota statutory scheme allows the commissioner to issue a body-art-technician

---

[8] An examination of body-art licensing requirements reveals a wide variation among states. In Oregon, for instance, a license requires a 360-hour course and 50 completed procedures, including 150 hours of practical tattooing experience, conducted under the supervision of an Oregon licensed tattoo artist. Or. Admin. R. 331-915-0005 (2016). In Arkansas, a prospective tattoo artist must complete a written examination and a six-month apprenticeship with a person who has been certified in that state for at least three years. Ark. Code Ann. § 20-17-1507 (West 2016). In other states, although a license or permit is required, more limited training in bloodborne pathogens and/or first aid is necessary. *See* Iowa Admin. Code R. 641-22.10 (135) (2016); Mont. Admin. R. 37.112129 (2016). And still other states do not regulate tattoo artists, but impose health-and-safety requirements on tattooing establishments. *See* Ky. Rev. Stat. § 211.760 (2015).

license to a person licensed in another state if the standards for licensure in that jurisdiction meet or exceed the Minnesota requirements. Minn. Stat. § 146B.03, subd. 8.[9] The burden on an out-of-state practitioner is also mitigated by the ability to receive temporary Minnesota licensure as a guest artist under Minnesota Statutes section 146B.04. *See* Minn. Stat. § 146B.04 (stating that a person may work as a guest artist for up to 30 days per calendar year on application and proof of completed coursework on bloodborne pathogens, prevention of disease transmission, aseptic technique, and infection control). The record does not reflect that Griepentrog applied for such a license in Minnesota.

The Dormant Commerce Clause does not intend to prevent states from legislating on subjects that relate to their citizens' health, life, and safety. *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 158 (4th Cir. 2016). Here, Griepentrog's burden of undertaking additional training is outweighed by the benefits of ensuring that all licensed Minnesota body-art technicians have been trained by technicians who practice in conformity with state-approved health and safety requirements. We reject Griepentrog's Dormant-Commerce-Clause claim.

## D E C I S I O N

The state has long had the power to regulate occupations to ensure the health and safety of its citizens. In this case, it has done so by setting clear standards for licensing

---

[9] Although Griepentrog would be unable to avail herself of that provision, she is able to practice body art in other jurisdictions, including Wisconsin, that have a lesser or no supervision requirement. *See* Wis. Admin. Code SPS § 221-04 (2016) (containing requirements for licensing body-art technicians in Wisconsin, not including supervision).

body-art technicians, which, in turn, provide standards for supervision. If members of a particular occupation abuse their power to exclude new members, antitrust laws provide redress for such claims. Because the supervision requirements of Minnesota Statutes section 146B.03 do not unconstitutionally delegate legislative power to private parties, do not violate principles of equal protection, and do not impermissibly burden interstate commerce, we affirm the denial of Griepentrog's application for body-art licensure in Minnesota.

**Affirmed.**